Charles S. FOLTZ, et al., Plaintiffs,

v.

U.S. NEWS & WORLD REPORT, INC., et al., Defendants.

David B. RICHARDSON, et al., Plaintiffs,

v.

U.S. NEWS & WORLD REPORT, INC., et al., Defendants.

Civ. A. Nos. 84–0447, 85–2195.

United States District Court, District of Columbia.

June 22, 1987.

Alan Raywid, John D. Seiver, Margaret E. Haering, Susan P. Baxter, Cole, Raywid & Braverman, Washington, D.C., for plaintiffs in Charles S. Foltz, et al.

Joseph M. Butler, George A. Bangs, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S.D., E. Roger Frisch, Walsh & Frisch, New York City, Raoul L. Carroll, Hart, Carroll & Chavers, Washington, D.C., for plaintiffs in David B. Richardson, et al.

Leslie A. Nicholson, Jr., Hannah E.M. Lieberman, Thomas J. Catliota, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for defendants U.S. News and Madana Realty.

Richard J. Wertheimer, Hadrian Katz, Edward Wolf, Arnold & Porter, Washington, D.C., for defendants Directors.

Lawrence Latto, William Galeota, Patrick M. Hanlon, Julie M. Edmond, Shea & Gardner, Washington, D.C., for defendant Profit-Sharing Plan.

Willis B. Snell, Willard K. Tom, Steuart H. Tomsen, Sutherland, Asbill & Brennan, Washington, D.C., for defendant American Appraisal Associates, Inc.

Avis Black, Buchanan Ingersoll, Washington, D.C., for defendant-intervenor Save the Fund.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

This memorandum opinion sets forth the Court's final ruling on the claims of former employee shareholders of U.S. News and World Report, Inc. ("U.S. News" or "Company") to proceeds from the sale of the corporation. The Company was purchased in 1984 by Mortimer Zuckerman, a Boston real estate developer, for a price of $176 million. Plaintiffs contend that during the period prior to the sale, when they were entitled to and did receive their share of the value of the Company's stock, the true worth of the stock was wrongfully concealed, that its appraised value was otherwise manipulated and miscalculated by defendants, and that they were deprived of the stock benefits and profit-sharing interests to which they were entitled. The litigation has been hotly contested. Serious and unsettled questions arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., are involved in this proceeding. While other legal issues are also presented under federal securities law, and the common law of fraud, breach of fiduciary duty, unjust enrichment and negligence, the questions arising under ERISA clearly predominate.

Throughout the course of the proceeding, counsel have ably briefed and argued in both their written memoranda and oral presentations the factual and legal issues involved. The questions presented for resolution have been fully considered. For the reasons set forth below in its factual findings and conclusions of law, entered pursuant to Fed.R.Civ.P. 52(a), the Court determines that plaintiffs have failed to support their claims, that judgment should be granted defendants on all counts, and the consolidated complaints dismissed.

## I. INTRODUCTION

### Course of the Litigation

#### The Complaints and Pretrial Motions

This litigation involves two consolidated complaints brought against U.S. News and several other defendants. Charles S. Foltz and others are plaintiffs in the first; David B. Richardson and others are plaintiffs in the second. At all relevant times, the Company produced and published the weekly news magazine, *U.S. News and World Report.* The Company also operated book and newsletter divisions; they were not particularly profitable and are of no great consequence to these proceedings.

*Foltz,* conditionally certified as a class action, presents the claims of some 230 former U.S. News employees. *See Foltz v. U.S. News & World Report, Inc.,* 106 F.R.D. 338 (D.D.C.1984). The class includes all persons who retired or were otherwise separated from employment with

the Company during the eight-year period from 1974 through 1981, other than several former directors who have been specifically excluded upon a finding that their interests were not typical of the class. Mr. Foltz and seven other named plaintiffs are the designated representatives for the class period. The *Richardson* action is brought by former employees who retired or separated from U.S. News in 1982.[1] During their employment, the plaintiffs in both actions participated in the U.S. News Profit-Sharing Plan ("Plan"). They were also beneficial owners of stock in the Company under its stock bonus plan. Upon retirement or separation, they liquidated their Plan accounts and redeemed their stock interests. In both actions, plaintiffs seek recovery of benefits they claim are owed them by virtue of an alleged undervaluation of the Company's stock during the class period.

Defendant U.S. News, organized at all relevant times under the corporate laws of the State of Delaware,[2] is headquartered in the District of Columbia. Other named defendants are certain former directors of U.S. News;[3] the Madana Realty Company ("Madana"), a wholly-owned U.S. News subsidiary; the U.S. News Profit-Sharing Plan, an employee benefit plan as defined by ERISA § 3(34), 29 U.S.C. § 1002(34); and American Appraisal Associates, Inc.

("American Appraisal"), an appraisal firm transacting business in the District and organized under the laws of the State of Delaware. American Appraisal performed the year-end appraisals of the U.S. News stock that are at issue here. A group designated as Save the Fund was allowed to intervene as defendants. The group includes currently employed or recently separated or retired U.S. News employees interested in preserving and eventually receiving that portion of the sale proceeds held back from distribution from the Plan by order of this Court.[4]

Over the three-year period during which these consolidated proceedings have been pending, discovery efforts have been thorough and extensive. Even so, many of the factual and legal issues originally presented were significantly narrowed by pretrial proceedings and motions for summary judgment.[5] By agreement and consent of all counsel, issues of liability and damages were bifurcated for separate trial.

The claims remaining after entry of partial summary judgment in each case were considered in an extended bench trial. The matters remaining in *Foltz* included: (1) claims for benefits due and owing from the Plan, under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B);[6] (2) claims for

1. Unless otherwise noted, the phrase "class period" shall be deemed to cover the period included in both the *Foltz* and *Richardson* complaints.

2. On September 30, 1985, a plan of reorganization was completed that transformed the Company into a limited partnership. The plan was carried out in the aftermath of the Company's 1984 sale to Mr. Zuckerman and has been the subject of a supplemental complaint brought in this proceeding. *See* 640 F.Supp. 1184 (D.D.C. 1986).

3. The director-defendants are John Sweet, Samuel Keker, Marvin Stone, William Dunn, Lester Tanzer, John Tuohey, Raymond Naimoli and James McIlhenny. Mr. Sweet succeeded U.S. News founder David Lawrence as Chairman of the Board and served in that capacity throughout the class period.

 U.S. News and its former directors are collectively referred to as the U.S. News defendants.

4. The *Foltz* plaintiffs moved for a preliminary injunction against distribution of the sale proceeds in August 1984, which relief was denied upon receipt of assurances from defendants that

plaintiffs and the Court would be given notice in advance of any intended distribution. Such notice was given in January 1985 and was followed in February by a renewed motion for preliminary injunction. The Court again denied the motion initially, 608 F.Supp. 1332 (D.D.C. 1985), but upon review the Court of Appeals, 760 F.2d 1300 (D.C.Cir.1985), ordered a partial hold-back of funds. 613 F.Supp. 634 (D.D.C. 1985). Upon motion of the *Richardson* plaintiffs, the Court held back an additional sum. Order of July 15, 1985. The funds subject to the two injunctions together total approximately $47.5 million, exclusive of accrued interest.

5. Prior decisions of this Court granted defendants partial summary judgment as to a number of the claims originally brought by plaintiffs. *See* 639 F.Supp. 595 (D.D.C.1986) (*Richardson*) and 627 F.Supp. 1143 (D.D.C.1986) (*Foltz*).

6. Section 502(a)(1)(B) provides that a participant or beneficiary of a plan may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

breach of fiduciary duty against U.S. News, the director-defendants and American Appraisal, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); [7] (3) claims against U.S. News, the director-defendants, and American Appraisal for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5; [8] (4) claims for common-law fraud against U.S. News, the director-defendants, and American Appraisal; and (5) claims for common-law breach of fiduciary duty, unjust enrichment, negligence and negligent misrepresentation against U.S. News and the director-defendants.

The matters remaining in *Richardson* included: (1) claims for benefits due against the Plan under ERISA § 502(a)(1)(B); and (2) claims against U.S. News and the director-defendants for negligence and negligent misrepresentation.

At the conclusion of plaintiffs' case-in-chief on the issue of liability, defendants filed motions for dismissal and judgment, pursuant to Fed.R.Civ.P. 41(b). In addition to opposing those motions, plaintiffs in the two actions filed motions to amend their complaints, under Fed.R.Civ.P. 15(b), on the theory that the facts actually litigated tended to support additional causes of action. The motion to amend the *Foltz* complaint was denied. The *Richardson* plaintiffs were granted leave to add section 502(a)(3) ERISA claims against the U.S.

News defendants for their alleged failure to have the Plan's holdings of U.S. News Class A stock properly appraised.[9] In an oral bench ruling, the Court granted in part defendants' motions, thus limiting the claims in both proceedings to those against the Plan for benefits due under ERISA § 502(a)(1)(B) and against U.S. News and the director-defendants for breach of fiduciary duty under section 502(a)(3) and for negligence. *See* Transcript of Proceedings, vol. 54 at 10,316-36.[10] All claims against American Appraisal were dismissed. An extended discussion of the ruling is presented *infra* pp. 25 ff.

As discussed above, plaintiffs in the consolidated actions seek to recover retirement benefits allegedly owed them under the Company's profit-sharing and stock bonus plans. Because ERISA affords an aggrieved plaintiff a right of action against a covered plan, plaintiffs brought an action for unpaid benefits directly against the Plan. With respect to their bonus stock interests, however, they must and they do seek recovery of monies allegedly owed them from U.S. News itself.

In addition, plaintiffs charge that the director-defendants, in concert with American Appraisal, acted both deliberately and negligently to cause their retirement benefits to be undervalued. Accordingly, plaintiffs seek recovery in the alternative from those defendants.

---

**7.** Section 502(a)(3) allows a plan participant, beneficiary or fiduciary to bring an action for equitable relief to enforce the terms of the plan in question and of the statute, to enjoin violations thereof, and to obtain redress for such violations.

**8.** Section 10(b) of the 1934 Act makes it unlawful for anyone

[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe....

Commission Rule 10b-5 makes it unlawful for persons to engage in deceptive, fraudulent, or misleading practices in connection with the purchase or sale of securities. Subsection (b) prohibits persons from making false or misleading

statements, or from omitting to state certain facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...."

**9.** The motion of the *Richardson* plaintiffs was prompted by an invitation, extended by the Court in its summary judgment decision, to seek leave to add such a claim at trial. *See* 639 F.Supp. at 608. The Court's subsequent bench ruling also reinstated a number of claims that had been previously ruled time-barred on summary judgment.

**10.** All subsequent references to the transcript of trial proceedings are cited in the following form: (vol). Tr. (page(s)). Plaintiffs' and defendants' exhibits are referred to as PX___ and DX___, respectively. Defense exhibits used only in *Richardson* are designated RDX___.

In the discussion that follows, the Court presents, pursuant to Rule 52(a), Fed.R. Civ.P., the basic and controlling facts developed during the liability phase of the trial, including the relevant history and operation of U.S. News. It then turns to a legal analysis of the claims and contentions advanced by the parties.

## II. FACTUAL FINDINGS

### History of U.S. News and World Report, Inc.

#### A. Events Occurring Before the Class Period

U.S. News & World Report, Inc. was formed on June 1, 1962 from the reorganization of the U.S. News Publishing Corporation ("U.S. News Publishing"), a Company established in 1933 by David Lawrence. Prior to the 1962 reorganization, all voting stock of U.S. News Publishing was held by Lawrence's three adult children, subject, however, to a voting trust, controlled by Mr. Lawrence as sole voting trustee. The non-voting stock was held in part by two trusts established for the benefit of Lawrence family members, and in part by certain employees who had been afforded an opportunity to buy stock. By 1962, 28 employees or members of their families owned 34 percent of the outstanding shares of the 1933 corporation.

The 1962 reorganization was undertaken with the intent and purpose that U.S. News would be owned entirely by its employees. Mr. Lawrence and the Company's Washington, D.C. counsel, the firm of Covington & Burling,[11] took the necessary steps to achieve that end, including an independent appraisal of the fair market value of the corporate shares and the submission of a request to the Internal Revenue Service that the proposed reorganization would not result in the loss of the tax-qualified status of the Plan, which Mr. Lawrence had established prior to 1962. The U.S. News Certificate and Articles of Incorporation ("Arti-

cles of Incorporation") also assured that the Company would remain employee-owned. Article Fifth, PX 2 at 7–12. Under the reorganization plan, U.S. News purchased the shares of U.S. News Publishing held by members of the Lawrence family at a price of $50 per share, determined by an appraisal performed by American Appraisal as of May 31, 1962. Consideration was paid partly in cash and partly in notes. Employees who individually held stock in U.S. News Publishing exchanged their stock for shares in U.S. News equivalent in value to what they had previously owned. The value of the U.S. News shares received by the employee stockholders was also determined to be $50 per share by the May 31 appraisal. U.S. News then sold to the Plan 30,000 shares of stock, again at a price of $50 per share.

After the reorganization, U.S. News had two classes of stock, "Class A" and "common." Each class had the same voting and liquidation rights. All Class A stock was owned by the Profit-Sharing Plan, and the stock would automatically be converted to common stock if it passed into the hands of anyone other than the Plan.

Immediately following the reorganization, 130,800 shares of U.S. News stock were outstanding: 30,000 shares of Class A stock were held by the Profit-Sharing Plan, and 100,800 shares were held directly by the employees who had previously owned stock in U.S. News Publishing. The 30,000 shares purchased by the Plan constituted approximately a 23 percent interest in U.S. News. It was contemplated, however, that the Plan would own a larger percentage with the passage of time and that it would eventually own nearly all the outstanding stock. This was so because shares owned by the 28 key employees would be redeemed as they reached the retirement age of 65, with each redemption increasing the Plan's percentage of the reduced amount outstanding, until ultimately the Plan

---

11. Mr. Don Harris, a Covington & Burling partner, was immediately involved in developing the reorganization plan and the necessary papers and documentation. Lamentably, he is the only person who, at this late date, is able to testify as

to events surrounding the reorganization. His testimony was not opinion or expert in nature, but rather he offered historical testimony on matters of objective fact. He did not construe any documents in a legal sense.

would own all but the relatively small number of common shares.

In 1966, the Plan purchased an additional 20,000 shares of Class A stock at a value of $80.00 per share, again determined by American Appraisal. This gave the Plan approximately 45 percent of the 110,574 shares then outstanding. During 1971, the 50,000 shares came to constitute a majority of the outstanding stock of the company, due to the repurchase by the company of outstanding common stock from employees who retired, died, or otherwise terminated their employment.

The reorganization plan did not contemplate any change in the actual control and management of the company, since all the common stock was placed in a voting trust with Lawrence as sole voting trustee. Thus, as sole voting trustee, he had the legal authority to elect the directors, both before and after reorganization. Mr. Lawrence served in that position until his death in 1973, at which time substitute trustees were named, in accordance with the voting trust instrument. In 1967, the Plan's Class A holdings were placed in the voting trust as well.

The persons responsible for the reorganization anticipated that employee ownership of U.S. News would take several forms: (1) the 28 employees who had been stockholders of U.S. News Publishing would hold shares of U.S. News & World Report ("key employee stock"); (2) since more widespread ownership by employees was desired, the Plan, in which most of the employees participated, would hold all the Class A stock; (3) the Company would institute a "stock bonus" program, issuing shares to employees every fifth year.

The U.S. News Profit-Sharing Plan provided income to employees upon their retirement, death, or separation from U.S. News.[12] Each employee who had attained the age of 25 and who had served for at least one year was entitled to participate. An employee became fully vested in the Plan after 10 years' service. The Plan was the primary means through which each employee secured an ownership interest in the Company. The employees could not, without the financial resources of the Plan, purchase all of the stock of U.S. News Publishing previously held by members of the Lawrence family. Thus the Plan's purchase of U.S. News stock permitted all employees to participate in the beneficial or economic ownership of the Company even though they did not have legal title to any shares individually. The Plan was always regarded as a conduit through which employees generally could participate in the growth of the Company. Benefits statements instructed Plan participants how to calculate the number of shares equivalent to their undivided interests in the Plan. *See, e.g.*, DX 94, 95. In addition to the Class A stock, the assets of the Plan also included other investments made with funds received in the form of cash contributions from U.S. News. The value of those investments is not at issue here.

Under the stock bonus program, common stock was issued to employees at five-year intervals beginning after the fifth anniversary of employment, and in amounts based on salary and length of service and on the appraised value of the Company's stock. The stock bonus program was thought to have psychological advantages over indirect ownership through the Plan, although each employee's bonus stock holdings were of a much lesser value than his Plan account.

In 1968, Mr. Lawrence instituted a deferred compensation program under which a specified number of shares of "phantom stock" were awarded to certain senior Company executives. The program was designed to give senior managers a greater incentive for superior performance. That program is discussed further, *infra* pp. 1508–09.

Because the stock of U.S. News was not publicly traded, it was necessary to determine the value of the stock—for the purpose of awarding and redeeming the bonus

---

12. An employee could normally elect either to receive a lump-sum payment, to have an annuity purchased on his behalf, or to leave his account to ride with the future investment fortunes of the Plan.

shares—by appraisal. In addition, because the Plan's major asset was a 50,000 share block of Class A stock, such appraisals were necessary to determine the value of the Plan's assets each year, in which value separating employees shared ratably when they settled their account balances.[13] The bonus and Class A shares were always valued equally.

### B. Events Occurring During the Class Period

#### 1. Real Estate Acquisitions

At the time of the 1962 reorganization, Madana had acquired three to four acres of partially developed real estate in the West End of Washington. Madana owned the land until late 1981, and approximately 75–80 percent of the holdings were used for U.S. News business operations, including a headquarters building, an employee cafeteria, and employee parking facilities. 26 Tr. 5089 (Sweet); 31 Tr. 6272–73 (Naimoli). The remaining portion was subject to commercial leases to third parties.

Before 1973, development of the real estate was not feasible because of zoning uncertainties, the character of the neighborhood, and the pendency of various proposals that would have required public use of portions of the land. *See, e.g.,* DX 118 at 2; PX 371 at 2. During the early 1970s, U.S. News and other West End property owners actively participated in proposing to local government officials a coherent development plan. In December 1974, the District of Columbia Zoning Commission promulgated zoning law revisions, changing a substantial portion of the Company's holdings from commercial to commercial-residential, while increasing the permissible "floor area ratio ("FAR")."[14] The remainder of its property continued to be zoned residential. U.S. News was not wholly satisfied with some aspects of the Commission's decision, for example, height restrictions on certain residential real estate adjacent to Rock Creek Park. Challenges to the rezoning decisions generally, including the height restriction, and lawsuits by other dissatisfied landowners continued for years after the decision was rendered, through late 1977.

In any event, during 1974 and immediately thereafter, the Company had no definite development plans for the real estate. While its directors and management were aware of the potential value of the real estate, they had no intention of selling those assets at that point in time. The appraiser who performed the year-end valuation for 1974, Mr. C.E.O. Walker, called as a witness by the *Foltz* plaintiffs, offered convincing testimony and cautioned, as an experienced professional, that any realizable value should be attributed to the real estate only "if it was evident that the controlling interest had a firm and clear intent to dispose of the real estate within a very short or reasonable period of time[, that is,] absolute evidence.... not mere development plans." 23 Tr. 4524. *See also* 23 Tr. 4505–12. Mr. Walker was highly qualified to give this opinion. He had previously served as international president of the American Society of Appraisers and was also a member of the College of Fellows of that organization. 23 Tr. 4493–95.

In February 1976, the Oliver T. Carr Company, a reputable real estate development firm, responded to a request to provide advice on the development potential of the U.S. News' real estate and the construction of a new headquarters facility. The Carr report and study noted that there were many possibilities for development of the property, but at the same time commented that the ultimate choice as to the character and timing of any project would depend on such unpredictable factors as market conditions and the Company's corporate objectives. The Carr Company com-

---

**13.** An employee settling his Plan account or redeeming his bonus stock in a given year would do so on the basis of the stock's value as of the close of the previous year.

**14.** "Floor area ratio" is the figure which expresses the total gross floor area as a multiple of the area of the building lot (or parcel). This figure is determined by dividing the gross floor area of all buildings on a lot by the area of that lot. In other words, a greater permissible FAR allows the owner to build more densely on his property.

pleted construction documents for a proposed headquarters building, following which U.S. News consulted with architectural planning and space design firms in anticipation of building. Nevertheless, no firm construction commitments materialized under the project development agreement with Carr.

In 1977, U.S. News management further explored with officers in the mortgage and trusts department of Riggs National Bank the financial feasibility of developing its real estate. Riggs advised that the Company's financial condition was not sufficiently strong and cautioned against undertaking any significant real estate developments at the time. On the strength of that advice, the Company deferred further consideration of building a new corporate headquarters and of pursuing any other development plans. Management discussed its hesitancy about immediate development with the employees, explaining further that if such developments were undertaken, they wanted to be certain that they would protect the Company from uncertain swings in its publishing-related business and assure a source of profits from which contributions could be made to the Plan. *See, e.g.*, PX 11 at 23, Question and Answer Session ("Q & A") at 2.[15]

In early 1978, U.S. News again discussed real estate development plans with Carr Company representatives. Several alternatives were considered including development of part of the land, a partnership arrangement with a developer, and relocation of U.S. News headquarters elsewhere. These alternatives did not materialize into binding development plans.

During the class period the U.S. News directors kept American Appraisal fully informed of all real estate acquisitions and their considerations regarding development of the property. American Appraisal representatives were familiar with the location, size and use of the property; knew that the property had great potential and unrealized value; and discussed in their

annual interviews with U.S. News officers the plans and considerations regarding possible development.

The working papers of the appraisers referenced contemplated developments of the property as presented in the 1976 Carr report. Their subsequent work papers and annual reports leading up to the 1981 joint partnership agreement with Boston Properties, Inc. likewise reflected full knowledge and awareness of those important events.

However, until the development plans matured into a firm and clear intent to build within a reasonably certain time frame, the realizable value of the real estate was not reflected in American Appraisal's annual reports or the Company's financial statements. This approach was supported by credible testimony of representatives from American Appraisal. *See, e.g.*, 23 Tr. 4505–12, 4524 (testimony of C.E.O. Walker). When more precise decisions were reached and it became certain that plans and discussions had ripened and definite goals and timetables were set, these facts were reflected in the annual valuations performed by American Appraisal in the last several years of the class period. In interviews with the appraisers who performed the 1979 valuation, U.S. News announced that it expected to make a decision on developing its real estate within the next year. PX 77. Indeed, the appraisers were told that there was a strong likelihood that the Company would participate in some type of venture and that real estate prospects were very promising. *Id.* The 1979 American Appraisal report reflected these discussions, noting that

management has recently begun studying various alternatives in the development of the company-owned real estate. There is a good possibility that after development, U.S. News will have a significant income producing property(s). While the development of the real estate, and income therefrom, may be several years away, some weight must be given

---

**15.** The question and answer session referred to was one of many that took place at the annual shareholder luncheons held throughout the

class period. PX 11 is the transcript of the 1978 meeting.

to this potential income source in valuing the common stock shares of U.S. News. PX 19 at 10.

In preparing the 1979 report, American Appraisal understood that U.S. News might decide to develop its real estate, and it considered the realizable value of the real estate not currently needed in U.S. News' publishing business to be a reasonable "proxy" for estimating the effect that possible future development might have on an investor's assessment of the value of U.S. News stock. *Id.* at 15–16.

Throughout this litigation, plaintiffs have challenged the uses to which the West End real estate was put. They charge that the U.S. News defendants should have regarded the property as an excess asset—beyond the Company's reasonable needs—and that instead they purposely decided and otherwise failed to utilize the land at its highest and best economic use. All of this, plaintiffs assert, was accomplished to their detriment and financial loss. Defendants have responded that the original real estate purchases were made "to protect [the Company's] right to grow." *See, e.g.*, PX 38, Q & A at 4. Several of plaintiffs' experts offered testimony as to what they regarded as excess real estate, which in their view the Company could have developed without interfering with its publishing business. Their testimony and analysis, however, was incomplete and flawed; they failed to consider fully the problems and uncertainties encountered by U.S. News before 1973 and continuing in lesser degree until the mid–70's, as discussed *supra*, pp. 1502–03. Those problems precluded any type of realistic development plans. Much more important and significant was the fact that their testimony presupposed that the interests of the plaintiffs and other shareholders similarly situated should have been valued on a control basis. *See infra* pp. 1514 –30.

■ One of plaintiffs' several contentions is that the defendant-directors, as fiduciaries, were derelict in failing to discharge their duties in determining and deciding U.S. News policy and keeping abreast of and knowledgeable about corporate affairs. This, they assert, was particularly true with respect to the annual appraisals performed by American Appraisal. The Court finds that such a claim is not supported by the record. The directors as a whole possessed varied abilities, training, and experience. Accordingly, they appropriately relied upon each other and, where necessary, on each other's particular expertise. This was true in many areas of the Company's business affairs.

Other than John Sweet, two other members of the board of directors were particularly knowledgeable, important and active participants in the day-to-day operating and long-range development of corporate affairs. Bert Padrutt and his successor, Raymond Naimoli, played central roles during the class period in their position as treasurer and chief financial officer. Their fellow board members recognized the training, experience, intelligence and expertise that they brought to their office. The other directors who testified at trial all asserted that they relied upon Padrutt's, and then Naimoli's, judgment and advice in matters relating to the requirements of the assignments undertaken by American Appraisal, major decisions relating to use of the real estate, corporate finances, and other matters involving business decisions as they related to and impacted on the employee shareholders and Plan beneficiaries.

Padrutt was a certified public accountant with more than 15 years experience when he entered on duty as controller and later treasurer. Before joining U.S. News, he had worked with the Ernst & Ernst accounting firm (now Ernst & Whinney) and had been involved in their annual audits of U.S. News. During his tenure as chief financial officer, he regularly conferred with representatives of American Appraisal when they undertook their assignments, and he made the department heads and other directors available for conferences with the appraisers. He also reviewed and discussed with the appraisers their final reports to ensure that he understood their basic assumptions, that they were appropriate and well documented and that the final report could be supported and defended.

The Court was left with the impression that Mr. Padrutt was a methodical, thorough and knowledgeable executive who knew what was required as chief financial officer under the circumstances. He understood the methodology employed by the appraisers and believed that their approach was appropriate. When it was required and dictated by the circumstances, he consulted with outside counsel, Don Harris of Covington & Burling, on matters relating to the Profit-Sharing Plan and employees' stock interests.

Naimoli was hired as chief financial officer in mid-1980. Like Mr. Padrutt, he possessed academic credentials and prior professional experience which equipped him for the position. As an accredited public accountant he had a previous and widening work experience with a major accounting firm, the Arthur Young Company. He also served for approximately 10 years as corporate controller for Scholastic Magazine, a reputable publication. Because U.S. News was experiencing unusual changes when he entered on duty and because of his recent introduction to U.S. News and to the appraisal of its closely held stock, he proceeded cautiously but with a recognition of immediacy. As did his predecessor, Naimoli consulted with Don Harris about the facts surrounding the 1962 reorganization, particularly the methodology to be employed in valuing U.S. News' stock.[16]

As a first assignment he reviewed prior efforts of the Company to develop its real estate with the hope of placing such efforts on a firmer track. *See* 30 Tr. 5982–84. In this connection U.S. News retained the law firm of Arnold & Porter in late 1980 to study development possibilities. In turn, Arnold & Porter hired the Julien Studley Company, a marketing consultant group, to assist in planning and to estimate current and projected values from development of the real estate. In January 1981, Arnold & Porter submitted an analysis of possible avenues for development, together with an optimistic report from Studley. Two alternatives were advanced for consideration: an immediate all-cash sale or a joint venture. On April 9, 1981, U.S. News distributed a prospectus developed by Arnold & Porter and Studley, soliciting a joint venture partner to develop its real estate. The Carr Company did not consider the proposal particularly attractive and did not submit a bid. Even so, on August 11, 1981, U.S. News signed a letter agreement with Boston Properties, Inc., providing for a series of limited partnerships to develop all of U.S. News' real estate parcels in the West End.

In December of 1983, an unsolicited offer was made to purchase the Company for $1,000 per share. The highest value at which the U.S. News stock had been appraised up to that point was only $470 per share. The employee-shareholders were advised and made aware of these developments. Accordingly, with the consent of a majority of the beneficial owners of its stock, U.S. News solicited bids for sale of the corporation during the following spring. The winning bid was that of Mr. Zuckerman, a principal of Boston Properties. The magazine was subsequently sold in October of 1984 for $176 million, or roughly $2,800 per share.

## 2. Acquisition of Other Assets

In addition to its real estate holdings, U.S. News acquired in 1975 and 1976 a minority stock interest in Atex, a supplier of photocomposition equipment to the magazine industry. While that stock was carried on the books at cost throughout the class period, when it was exchanged in 1981 at a significant profit for stock in the Eastman Kodak Company, the transaction was in part reflected in the 1981 annual appraisal. In 1978, U.S. News acquired a minority block of stock in Publishers Phototype, Inc., another photocomposition company. In 1981, U.S. News made other investments and acquisitions, primarily in the

---

**16.** In addition, members of the Board, throughout the class period, relied upon the audits of the Plan's financial statements by the accounting firm of Ernst & Whinney. Two of the auditors testified at trial that Ernst & Whinney's review of the appraisal methodology used to calculate the value of the Class A shares was appropriate and reasonable. *See* 59 Tr. 11,398–99, 11,448–49 (McMahon); 60 Tr. 11,607–10 (Dietrich).

phototypesetting field. American Appraisal's treatment of these assets is considered *infra,* pp. 1530–33.

. . . . .

The *Foltz* complaint was filed in February 1984, when previously retired employees learned from newspaper accounts that the December 1983 offer of $1,000 per share had been made. *See* 2 Tr. 216–18, 274–75 (Foltz). The *Richardson* suit followed and was filed in July of 1985. It was consolidated with *Foltz* in March of 1986 for pretrial proceedings and trial.[17]

## III. ANALYSIS

While sometimes lost sight of, the central issue requiring resolution in this litigation has always been the propriety of the methodology employed in appraising the U.S. News stock. Plaintiffs maintain that the annual stock valuations, performed for U.S. News by American Appraisal, were not only grossly inaccurate throughout the class period, but were the result of collusion between those two defendants. Their basic quarrel with the appraisals is that they did not value the Plan's stock holdings, which constituted a majority of the Company's outstanding stock, on a control basis. This alleged failure, in turn, resulted in the minimization or exclusion from the appraisals of the value of the Company's non-operating assets, primarily the real estate.

As analyzed by the Court in its summary judgment opinion entered in *Richardson,* plaintiffs' claims in both actions fall more or less neatly into two categories. *See* 639 F.Supp. at 599. The first comprises claims premised upon intentional or fraudulent conduct and includes claims for breach of the fiduciary duty of loyalty under ERISA § 502(a)(3), securities and common-law fraud, common-law breach of fiduciary duty, and unjust enrichment. The second encompasses claims based upon negligent, imprudent, arbitrary or capricious conduct and includes claims for benefits due under ERISA § 502(a)(1)(B), for breach of the fiduciary duty of care under ERISA § 502(a)(3), and for negligence and negligent misrepresentation. The effect of the Court's summary judgment decision in *Richardson* and of its ruling on defendants' Rule 41(b) motions in *Foltz* was to dismiss all those claims premised upon intentional or fraudulent conduct, on the grounds that there was no evidence in the record that any of the defendants engaged in any course of conduct designed deliberately to undervalue the Company's stock. *See* 639 F.Supp. at 603–10; 54 Tr. 10,326–27, 10,328–33.

What remains are plaintiffs' allegations that U.S. News, the director-defendants, and the Plan acted negligently or unreasonably in accepting American Appraisal's valuations for each of the class years. The second portion of the trial as to liability, commencing with the beginning of defendants' case-in-chief, dealt extensively and exclusively with whether the appraised values were reasonable in light of the circumstances. In this connection, plaintiffs and defendants presented several expert witnesses each. Their testimony addressed the issue of whether what was done during the class period conformed to acceptable and recognized procedures and standards

---

**17.** The 1984 sale of U.S. News occasioned a number of other lawsuits. Two of the directors who had been excluded from the class, *see supra* p. 1497, filed independent actions, *John H. Adams v. U.S. News & World Report, Inc.,* C.A. No. 85–4038, and Estate of *Ben Grant v. U.S. News & World Report, Inc.,* C.A. No. 86–0156. *Adams* was dismissed by stipulation of the parties, Order of March 13, 1986, while *Grant* was dismissed upon summary judgment. 639 F.Supp. 342 (D.D.C.1986).

On May 12, 1986, a former employee who had retired in 1983 filed suit and hoped to have his case consolidated for trial with *Foltz* and *Richardson, James E. Sacra v. U.S. News & World Report, Inc.,* C.A. No. 86–1297. That very ambitious request was denied by Order of August 17, 1986. *Sacra* is currently awaiting the outcome of *Foltz* and *Richardson.*

Finally, on January 29, 1987, after trial of *Foltz* and *Richardson,* two additional former employees filed suit, represented by the *Richardson* counsel, *Russell W. Fritz v. U.S. News & World Report, Inc.,* C.A. No. 87–0207 and Gaynelle L. *Mallard v. U.S. News & World Report, Inc.,* C.A. No. 87–0208. Mr. Fritz retired in 1982 and Ms. Mallard in 1983. Those cases are again awaiting a ruling on the claims in these consolidated proceedings.

and was otherwise appropriate and, if not, what should have been done. Defendants also presented an additional expert, Mr. Chester Gougis, who had undertaken an independent, "blind" appraisal of the Company's stock during each of the class years. His testimony was proffered to corroborate American Appraisal's valuations.

After consideration of the expert testimony presented, the Court is not persuaded that the appraisal methodology was improper or flawed, or that the per-share price arrived at each year by American Appraisal did not fall within a reasonable range of acceptable values. Having decided that the appraised values were reasonable, the Court must and does conclude that their acceptance and use by U.S. News was reasonable and thus cannot form the subject of any cause of action. Accordingly, the Court determines that plaintiffs have simply suffered no redressable injury, initial appearances aside. The Court also concludes that, because the Plan stock was reasonably valued on a minority-interest basis, the common or bonus stock was necessarily properly so valued.

The Court now presents its findings of fact and conclusions of law with respect to defendants' motions under Fed.R.Civ.P. 41(b), which dealt solely with the issue of intentional or fraudulent conduct. It then addresses the controversial and central issue dealing with the appropriate appraisal methodology.

### A. Defendants' Motions to Dismiss and for Judgment Under Rule 41(b), Fed.R.Civ.P.

The Court's bench ruling on defendants' Rule 41(b) motions served to narrow further the issues remaining to be considered following plaintiffs' case-in-chief. The initial findings announced from the bench were not detailed. It is thus necessary to flesh out the findings of fact and conclusions of law in greater depth as contemplated under Fed.R.Civ.P. 52(a). In ex-

panding upon its previous oral ruling, the Court again notes that, "[i]n a case tried without a jury, the trial court is not required to consider the evidence in the light most favorable to the plaintiff in determining whether to grant a motion to dismiss under Rule 41 made at the completion of the plaintiff's case." *Woods v. North American Rockwell Corp.*, 480 F.2d 644, 645–46 (10th Cir.1973). "Rather, the court is required to weigh all the evidence, resolve any conflicts and ... decide itself where the preponderance lies." *Albright v. United States*, 558 F.Supp. 260, 264 (D.D.C.1982), *aff'd*, 732 F.2d 181 (D.C.Cir. 1984).

The bench ruling eliminated from *Foltz* all claims premised upon intentional or fraudulent conduct—that is, claims for securities and common-law fraud, common-law breach of fiduciary duty and unjust enrichment, as well as claims for breach of the fiduciary duty of loyalty under ERISA § 502(a)(3). All such claims had previously been considered and eliminated from *Richardson* on summary judgment, so that the bench ruling in *Foltz* placed both cases on equal footing.

As originally pleaded, plaintiffs' claims of intentional or fraudulent conduct on the part of the several defendants appeared at first blush to be superficially plausible. Their seeming vitality and strength sprang from an initial perception that the class plaintiffs had been treated unfairly compared with those U.S. News employees who had benefited from the 1984 multimillion dollar sale of the Company. As the trial unfolded,[18] however, it became increasingly apparent that the claims were not supported by reliable and credible evidence. Indeed, with the benefit of a considerable record of discovery and trial testimony, it is clear that the various claims to some degree are mutually contradictory. Plaintiffs charge both that U.S. News conspired with American Appraisal to undervalue the

---

**18.** While in *Richardson* defendants challenged the substance of plaintiffs' claims of fraud or other intentional wrongdoing on summary judgment, resulting in their dismissal, the *Foltz* summary judgment motions for the most part only dealt with certain threshold legal questions. Therefore, as of the commencement of trial, many claims of fraud or other intentional wrongdoing remained for resolution in *Foltz.*

Company's stock and withheld information from the appraisers. In this way, plaintiffs portray the appraisers both as active wrongdoers and as unwitting dupes. While such a contradiction might have been tolerable at the pleading and discovery stage, its continued existence at trial indicates that plaintiffs simply failed to develop a reasonable and plausible theory of their case in this respect. Accordingly, those defendants accused of intentional or fraudulent conduct—that is, U.S. News, the director-defendants, and American Appraisal—moved to dismiss all claims against them premised on such conduct.

### 1. Claims Against the U.S. News Defendants

Plaintiffs have failed to carry their burden of demonstrating that U.S. News conspired with American Appraisal in any way to manipulate the appraisal process and to undervalue the Company's stock. The same is true of their claim that the U.S. News defendants withheld information from American Appraisal concerning the Company's real estate development plans, or that the Company and its directors withheld information from the employees concerning those plans and concerning the appraisal methodology employed generally. None of these claims finds support in the testimony presented by plaintiffs.

#### a. Conspiracy with American Appraisal

■ To demonstrate a conspiracy between U.S. News and American Appraisal, plaintiffs succeeded in pointing to only two instances of alleged wrongdoing, arising from the year-end 1978 and 1980 appraisals, from which they urge the Court to draw an inference of fraudulent conduct. Such an inference would be completely unwarranted, as is discussed in connection with the claims against American Appraisal, *infra.*

In addition to the absence of any conspiratorial conduct on the part of the U.S. News directors, defendants have pointed to the absence of any motive on their part for undervaluing the Company's stock. They argue instead that, like any managers, they had every reason to maximize the value of the Company's stock in each year. Plaintiffs insist, however, that the operation of the deferred compensation structure set up for the benefit of the directors supplied a motive for undervaluing the stock.

Subsequent to the 1962 reorganization, U.S. News directors and officers were no longer able to purchase shares in the Company.[19] Instead, a deferred compensation plan was instituted, briefly noted *supra,* whereby directors and other key employees were awarded blocks of "phantom stock," redeemable upon retirement at the appraised price of the Company's Class A and common shares. The phantom stock shares could not be voted and were subject to forfeiture if the awardee left the Company before normal retirement.

While such shares were awarded at periodic intervals until each holder received a maximum of 2,400 shares, in 1982, for various reasons that have been fully explored and dealt with elsewhere, *see* 639 F.Supp. at 604–05, and which with benefit of later trial testimony need not be further discussed, awards to several eligible persons were accelerated by the Board. When the Company was sold in 1984, the phantom stockholders received payment for their shares from Mr. Zuckerman, but at a price considerably less than that paid for the Class A and common stock.

Throughout this litigation, plaintiffs have maintained that there was something wrongful about the phantom stock awards. Unfortunately, they have failed to articulate exactly what it is that the Court should be concerned with. *See* 627 F.Supp. at 1174. Presently, they argue that the awards created in the director-defendants some perverse incentive for undervaluing the Company's stock during the class period. Specifically, they have attempted to show that the directors were concerned that a rapid rise in the amount of benefits to be paid separating employees, triggered by a "full" valuation of the Company's

---

**19.** Neither were they eligible to participate in the stock bonus plan. They were eligible to participate in the Profit-Sharing Plan.

stock, would have forced the Company to be prematurely liquidated before they could "cash in" their phantom stock interests. If anything, however, the natural incentive on the part of the directors would have been to ensure that the Company's stock be fully valued on *whatever* date their phantom stock obligations were to be redeemed. Defendant Keker, for instance, was concerned that, upon his reaching retirement age in 1982, his key employee shares [20] should not be redeemed until sometime later. 4 Tr. 793–800. If it were only a question of manipulating the appraisal process, he would have been interested in "manipulating" the 1981 valuation upward, knowing that he faced his normal retirement date in 1982. Similarly, other directors redeemed stock during the class period and thus would have made unlikely participants in a conspiracy to undervalue the Company's stock during that time. *See Estate of Grant v. U.S. News & World Report, Inc.,* 639 F.Supp. 342, 345–46 (D.D. C.1986) (Ben Grant); 25 Tr. 4996 (Howard Flieger); PX 1 (Robert Osmond, John Adams).[21] Not only does plaintiffs' theory appear fanciful and illogical, but more importantly it is contradicted by the only credible testimony and documentation in the record.

Accordingly, the Court lays to rest, and with finality, any concern that the deferred compensation rights awarded to individuals at U.S. News were somehow wrongful.

### b. Nondisclosure of Information to American Appraisal

■ It is undisputable that U.S. News gave American Appraisal all relevant information regarding the 1981 joint venture agreements. *Richardson,* 639 F.Supp. at 603–04. While plaintiffs might quarrel with the manner in which American Appraisal treated this information in the 1981 valuation, certainly nothing that was done or not done is in any way reflective of

fraud or intentional misconduct. It is true, however, that American Appraisal's treatment of the U.S. News real estate in 1981 was more involved than usual. But if the appraisers gave less attention to the real estate in prior appraisals, it was not because U.S. News had withheld information from them.

In 1981, when the year-end 1980 appraisal was conducted, U.S. News had received the Julien Studley report, analyzing the development potential of the Company's real estate. When chief financial officer Ray Naimoli offered the report to the appraiser, David Marshall, Mr. Marshall indicated that, in the absence of a firm commitment by a developer, such a study would not be relevant to an appraisal of the Company's stock. 31 Tr. 6245, 6247–48 (Naimoli). Nevertheless, Naimoli told Marshall that Studley had arrived at a FAR value of $53.[22]

The only other real estate plans of note were contained in the 1976 proposal of the Oliver T. Carr Company to construct a new headquarters building. The notes of the appraisers who performed the 1975, 1976 and 1977 appraisals knew of the Carr plans. PX 782 at 10,875; PX 294. Mr. Marshall, who did the appraisals for 1978 through 1981, contacted the Carr Company himself with regard to the 1978 report and was directed to the Carr Company by U.S. News with respect to the 1979 report. PX 67, 77, 85.

Not only did U.S. News not withhold information relevant to its real estate development plans, but by the admission of plaintiffs' own real estate expert, Mr. William Harps, such proposals in the absence of a finalized plan for development would not even be relevant to a real estate appraisal, much less to a stock appraisal. *See* 33 Tr. 6599; 34 Tr. 6766–69. For that

---

**20.** Mr. Keker held 2,400 shares of key employee stock, which he acquired before the reorganization. 3 Tr. 428–30. Yet whether he held phantom stock or key employee shares, his incentive not to have those shares undervalued would have been the same.

**21.** Indeed, former directors Grant, Adams, Osmond, Flieger and Kirby were originally members of the plaintiff class, but were later excluded. *See supra* pp. 1497–98; *see also Estate of Grant,* 639 F.Supp. at 344.

**22.** With a FAR of 6, the $53 value works out to $320 per square foot.

same reason, Marshall's lack of interest in the 1980 real estate analysis offered him by Naimoli was not unjustified.

### c. Nondisclosure of Information to U.S. News Employees

■ Plaintiffs contend that the U.S. News defendants wrongfully concealed information about the Company and its appraised value that would have been relevant to them. In its summary judgment ruling, the Court recognized that, if plaintiffs could show that they would have altered their retirement plans upon receipt of information that had been withheld, information indicating that the Company was undervalued, they could make out a claim for securities fraud and, by extension, common-law fraud. *See* 627 F.Supp. at 1159–61. On the present record, however, it is clear not only that there was nothing to conceal—the Company's stock had not been undervalued—but that U.S. News did disclose information relevant to the areas of concern here.

First, U.S. News made no attempt to conceal the fact that American Appraisal valued the Company every year on a minority-interest basis. At the annual spring shareholder luncheons beginning in 1974, and at more informal gatherings, Chairman John Sweet and other members of the Board freely disclosed that the Company could be sold for several times the value that one would obtain if one were to multiply the appraised price per share by the number of outstanding shares. Even if this information, spelled out specifically at the 1978 annual shareholder luncheon, *see* PX 11, Q & A at 11, did not make the matter plain enough, certainly such a revelation would be inconsistent with an attempt to keep the information secret. *See Richardson,* 639 F.Supp. at 603 n. 16.

As a general matter, the annual shareholder luncheons afforded employees an opportunity to obtain a fair amount of information about the financial circumstances of the Company. While Mr. Lawrence met with his employees on a regular basis, he tended to be relatively tight-lipped about

Company affairs, fearing the leak of information that might prove helpful to competitors. Mr. Sweet, on the other hand, was more forthcoming in answering employees' queries about their Company. *See* 2 Tr. 333–35 (Foltz). Beginning with those for year-end 1976, Sweet distributed written summaries of the Company's financial statements, in advance of the annual luncheons. PX 144–48. At the meetings Sweet would cover the Company's financial developments during the previous year in some detail. Employees were invited to ask questions at the conclusion of his remarks. There were no limits on the questions that could be asked,[23] and no one was made to feel inhibited. *See* 2 Tr. 251 (Foltz). Transcripts were made available for all those who could not attend the meetings, including those persons assigned to stations outside the Washington area.

With respect to the treatment of the real estate in the annual appraisals, the absence of any attempt to conceal relevant information is even more striking. At the 1974 shareholder luncheon, for instance, Mr. Sweet, recently elected Chairman of the Board, told those present that the Company's real estate was carried on the books at only one-third of its full value. PX 37, Q & A at 12. While in ruling on the *Foltz* motions for summary judgment, the Court declined to find that that revelation removed any material issue of fact as to notice on the part of plaintiffs, 627 F.Supp. at 1151, the situation is somewhat different in the present posture of this case. First, whether or not Chairman Sweet's remarks were sufficient to impute notice to the class is a question that must be answered only upon a finding that defendants engaged in a course of conduct designed to conceal some alleged wrongdoing. On the present record, however, it is clear that no such concealment was attempted. Rather, Sweet's remarks at the 1974 luncheon are merely illustrative of management's lack of interest in keeping things secret. Second, at the summary judgment stage, the Court was concerned that plaintiffs' knowledge of

---

**23.** Mr. Sweet, as a matter of policy, declined to answer employees' questions concerning the

compensation of persons working for the Company.

how the real estate was treated on the books might shed too little light on their understanding of how it was treated in the appraisals. *See* 627 F.Supp. at 1151. However, after the conclusion of plaintiffs' case-in-chief, it became evident that plaintiffs were under no misapprehension as to whether the Company's potential real estate bonanza was fully reflected in the appraised value of its stock. In fact, several of the class plaintiffs testified freely at trial that, during the class period, they believed that the real estate was undervalued and not adequately accounted for in the annual appraisals. *See* 2 Tr. 406–08 (Foltz); 24 Tr. 4850 (Edward Castens). In view of such sentiments among its employees, the Company's disclosure that its real estate was carried at only one-third of value is certainly inconsistent with any plan of concealment.

Neither did management attempt to conceal the status of the Company's plans for the development of its land. *See, e.g.,* 2 Tr. 354–59 (Mr. Foltz was generally aware of the Company's development plans). Employees were told when plans toward the construction of a new headquarters building were suspended; they were notified when prospective joint venture partners were solicited in 1981 and, again, when the joint venture agreements were signed with Boston Properties later that year. At the same time that they were told of the joint venture solicitations, plaintiffs were pointedly advised that they might want to consider leaving their account balances in the Plan so that they might share in and secure the benefits of the anticipated increase in the value of the Company's stock. PX 50.

Plaintiffs point to two instances, however, where management was in their view less than forthright in keeping them advised of relevant information. First, they adduce a December 1980 memorandum to Company department heads from Mr. Sweet, PX 319, which enclosed a second memorandum to be circulated to employees, notifying them of potential development plans. In the cover memorandum,

Sweet instructs the department managers not to go beyond the contents of the enclosed memorandum in their discussions with employees. When the *Foltz* summary judgment motions were considered, it seemed at least plausible that the cover memorandum suggested a secretive attitude on the part of management, consistent with a pattern of concealment. 627 F.Supp. at 1153. After considering the relevant trial testimony, however, the Court has little doubt that Mr. Sweet's real concern was that employees not be provided with overly optimistic assessments of future developments, which might have led them to act hastily in making their retirement plans. *See* 25 Tr. 4941 (Sweet).

Plaintiffs similarly point to an October 21, 1980 letter from Treasurer Bert Padrutt to outside counsel Don Harris, PX 317, in which Padrutt questions Harris about potential liability to employees who might retire between the announcement of development plans and the next appraisal. Padrutt was concerned that such employees, who would receive benefits based on the value of the Company's stock as of the close of the last calendar year, would feel deprived in not benefiting from any increase in the value of the Company's stock during the current year. In fact, to avoid precisely this contingency, the directors voted subsequent to the signing of the joint venture agreements in 1981 to award benefits to employees retiring between that date and December 31, 1981 based upon the value of the stock as of the latter date. *See* 42 Tr. 8255–57 (Padrutt).

**2. Claims Against American Appraisal**

Upon entry of partial summary judgment for defendants in *Foltz*,[24] the claims against American Appraisal for intentional wrongdoing were reduced to claims for securities and common-law fraud arising out of the conduct of the year-end 1978 and 1980 appraisals and for participation with the U.S. News defendants in a breach of fiduciary duty under ERISA § 502(a)(3)

---

**24.** On summary judgment in *Richardson*, all claims against American Appraisal were dismissed.

with respect to the appraisals for 1977 through 1980. On closer inspection, however, the record reveals no such conduct either on the part of U.S. News and the director-defendants or American Appraisal.

With respect to the 1978 and 1980 appraisals, plaintiffs point to certain apparent irregularities that they claim indicate a deliberate undervaluation of the Company's stock. In ruling upon defendants' motions for summary judgment, the Court believed that further inquiry into these matters was merited and, consequently, declined to grant defendants summary judgment as to claims arising out of these instances of apparent misconduct. *See* 627 F.Supp. at 1152–53, 1156, 1163, 1179–81. With benefit of relevant testimony and a full trial record now before the Court, it is clear that these challenges are lacking in merit.

■ Pointing to the 1978 appraisal, plaintiffs complain that the final value of $105 per share was arrived at after a senior appraiser, not otherwise involved with the valuation for that year but who had done appraisals in prior years, provided U.S. News with that figure in advance of the completion of the final report. The two appraisers assigned to the valuation for that year had arrived at a somewhat higher preliminary figure of $117–118, but acquiesced in the $105 value. The more senior of the two appraisers testified that he was actually more comfortable with the second approach and that, in any event, any figure within the range of $105 to $118 would have been reasonable. 28 Tr. 5571–87; 29 Tr. 5913–16, 5950–51 (John Russell). It is undisputed that U.S. News knew only of the $105 number and was not privy to any discussions among the appraisers of any other figures. Hence, the final value of $105 could not have been the product of any collusion between U.S. News and American Appraisal and was not the result of a venal desire to keep the value per share as low as possible. Moreover, because the testimony demonstrates, and the Court finds, that the appraised price of $105 per share was within a range of reasonable values, the publication of that value by American Appraisal cannot be seen

as the result of any deliberate misconduct, nor its acceptance by U.S. News as unreasonable.

■ With respect to the 1980 appraisal, plaintiffs charge that the appraiser might have been improperly influenced by a remark, made by Mr. Naimoli during a standard interview, that a certain range of values had been given to the Company's auditors for use in performing some unrelated calculations. *See* 627 F.Supp. at 1153 & n. 12. The uncontroverted testimony is that there was no such influence and that the remark was perfectly innocent. Hence, no possible liability could attach to its utterance.

■ Plaintiffs' ERISA claims against American Appraisal fare no better. In ruling on that defendant's motion for summary judgment in *Foltz*, the Court held that, with respect to claims falling within the statute of limitations period (*i.e.*, those arising out of the 1977 through 1980 appraisals), American Appraisal might be liable for participating in or furthering a fiduciary breach on the part of U.S. News and the director-defendants. *See* 627 F.Supp. at 1156, 1168. Yet, as is now apparent, there was no breach of fiduciary duty on the party of U.S. News or its directors. Such a breach would have occurred, under plaintiffs' theory of the case, if those defendants had sought intentionally to undervalue the Company's stock to the detriment of the employee participants in the Plan. However, the Court finds that there is no evidence in the record to support a finding that defendants engaged in any sort of deliberate misconduct. Moreover, as discussed *infra*, the Court further finds that the Company's stock was not undervalued at all.

In sum, plaintiffs have failed to support their claims by a preponderance of the evidence. After months of testimony, the record clearly shows that neither U.S. News, its directors, nor American Appraisal engaged in any scheme of deliberate misconduct designed to defraud or otherwise injure plaintiffs in any way.

## B. The Nature of the Court's Inquiry—Valuation Issues

This litigation is concerned not with fraud, but with the proper apportionment of the proceeds or benefits from the sale of an employee-owned business. As the law stands now, such proceeds will not be distributed to former employees who left the business prior to the sale, unless it can be shown that they would have been entitled to a greater portion of benefits at the time they separated. In other words, the approach to be used is not retrospective, but prospective. One must look at the situation as of the time that each employee separated from the Company. Therefore, the appropriate inquiry is whether the Company was properly valued during the class period, not whether former employees become eligible for a greater share of benefits upon the contingency of a subsequent sale.

Employee benefits plans, like the one at issue here, are governed by two spheres of regulation, the private and the public.[25] Such plans are established by private parties—either by the employer acting alone, or by agreement between the employer and employees—and generally operate according to the terms established by the controlling documents. If, however, one or more of such terms conflicts with any provision of federal regulation, in this case ERISA, then those terms are rendered invalid. Hence, in examining whether plaintiffs are owed additional benefits, one must answer two questions. First, under the terms of the documents governing the Profit-Sharing Plan, are plaintiffs owed greater benefits than they received? Second, if not, are there supervening provisions of federal law that render the relevant Plan provisions invalid and that entitle plaintiffs to greater benefits? Finally, if neither the Plan provisions nor the requirements of ERISA speak directly to the issue here raised—the proper amount of plaintiffs' benefits—then the Court must satisfy itself that what was done falls within a range of conduct permitted by both spheres of governance.

### 1. Standard and Scope of Review

In the *Foltz* summary judgment decision, it was unnecessary to define exactly the appropriate standard against which the conduct of plan fiduciaries should be judged, since it was found that plaintiffs were not entitled to summary judgment on their ERISA claims under even the least deferential standard. 627 F.Supp. at 1169–70. The Court did note that a determination of pension eligibility or of the appropriate level of benefits to be paid appeared to be governed by the "arbitrary and capricious" standard of review, *id.* at 1169 & n. 55, even though that standard might be applied with a "stern hand and flinty eye," *id.* at 1170 (quoting *Maggard v. O'Connell,* 671 F.2d 568, 572 (D.C.Cir.1982)).

Plaintiffs continue to urge the Court to adopt a stricter "prudent man" standard, found in section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B). That section requires a fiduciary to discharge his duties "with the care, skill, prudence, and diligence under the circumstances ... that a prudent man ... would use...." While that provision does appear, at least superficially, to demand application of a "prudent man" standard, the relevant case law makes it fairly clear that it has no application to the present situation.

A useful gloss is placed on the requirements of section 404(a) by *Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325 (3d Cir.1984). *Struble* acknowledged that courts have generally adopted an "arbitrary and capricious" standard in assessing the denial of personal claims for benefits. *Id.* at 333. The court then contrasted such a situation with those presented in *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984) and *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

---

25. While state courts are granted concurrent jurisdiction to hear actions for benefits due under ERISA § 502(a)(1)(B), *id.* § 502(e)(1), 29 U.S.C. § 1132(e)(1), with limited exceptions ERISA preempts all state laws governing employee benefit plans. *Id.* § 514(a)–(c), 29 U.S.C. § 1144(a)–(c).

In both *Cunningham* and *Bierwirth*, the fiduciary charged with improper conduct could be said to have either subordinated the interests of the plan beneficiaries to those of a third party, or to have wasted plan assets. The *Struble* court concluded that in such situations the appropriate standard of review was that contained in section 404(a) and not the "arbitrary and capricious" standard. 732 F.2d at 333–34; *see also Fink v. National Savings and Trust Company*, 772 F.2d 951, 955–56 (D.C.Cir. 1985). The "arbitrary and capricious" standard does apply, however, where the issue is whether the plan fiduciaries have properly balanced the interests of different classes of beneficiaries. Fiduciaries thus have broad discretion to resolve the often competing concerns of present and future claimants in order to preserve the financial stability of funds while allocating assets to the advantage of all beneficiaries. *Id.*

A number of courts have followed *Struble* in its analysis of the proper scope of review, or have otherwise found that the "arbitrary and capricious" standard is appropriate in assessing a fiduciary's interpretation or implementation of plan terms, when no outside interests press on the balance. *See, e.g., Holland v. Burlington Industries, Inc.*, 772 F.2d 1140, 1148–49 (4th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986); *Edwards v. Wilkes-Barre Pub. Co. Pension Trust*, 757 F.2d 52, 55–57 (3d Cir.1985), *cert. denied*, 474 U.S. 843, 106 S.Ct. 130, 88 L.Ed.2d 107 (1986); *Ganze v. Dart Industries, Inc.*, 741 F.2d 790, 792–93 (5th Cir.1984).

Without discussing the dichotomy posited in *Struble*, our Circuit Court has nevertheless recently held that, where trustees face a choice between reasonable alternatives in interpreting or implementing the terms of a plan "[c]ourts will substitute their judgment for that of trustees only if the trustees' actions are not grounded on any reasonable basis. Choices between reasonable alternatives, it follows, are for the trustees, not the courts." *Stewart v.*

*National Shopmen Pension Fund*, 795 F.2d 1079, 1083 (D.C.Cir.1986). In *Stewart* a change in pension calculation, *inter alia*, reduced monthly pension benefits to a 74-year-old retiree from $80 to $9. Even so, the trustees' action was reviewed under the arbitrary and capricious standard.

■ In determining whether a fiduciary's interpretation of the terms of a plan document is arbitrary or capricious, four factors should be considered: (1) whether the interpretation is contrary to the language of the plan; (2) whether it is consistent with the purposes of the plan; (3) whether it is consistent with the purposes of the particular provision itself; and (4) whether it is consistent with prior interpretations and whether beneficiaries were on notice of the interpretation. *Donovan v. Carlough*, 576 F.Supp. 245, 249 (D.D.C. 1983), *aff'd mem.*, 753 F.2d 166 (D.C.Cir. 1985). With these factors in mind, the Court now turns to a consideration of the controlling documents under which the Plan was operated: the U.S. News Profit-Sharing Plan Document, PX 6, ("Plan Document") and the Articles of Incorporation, PX 2.

#### 2. The Controlling Documents

The U.S. News Profit-Sharing Plan was established as "a defined contribution plan," into which the Company paid contributions on behalf of its employees, based upon their compensation, up to a maximum limit. While each member of the Plan had his own account, Plan Document ¶ 6.2,[26] the accounts together constituted "a [single] fund [to] be invested and administered as a unit." *Id.* ¶ 6.3. Those investments included a modest portfolio of marketable securities and, most importantly, the 50,000 shares of U.S. News Class A stock. The net value of a member's account was stated to be his "undivided share of the cash, securities and other property in the Fund," including the Class A stock. *Id.* ¶ 6.4. No

---

**26.** While the original Plan Document was amended from time to time, none of the

changes made are material to this litigation.

member was deemed to have title to any specific assets of the Plan. *Id.* ¶ 6.11.

The Plan Document in paragraph 6.3 further provided that the value of the Class A stock was to be determined each year in accordance with Article Fifth (e) of the Articles of Incorporation. Article Fifth established the mechanism by which the beneficial ownership of the Company was to vest in its employees, "directly or through the corporation's profit-sharing trust." Its provisions thus governed both the Class A and common stock. Under Article Fifth (b), a holder of stock could not sell, transfer or otherwise encumber his shares; if he attempted to do so, the Company at its option could call the shares under Article Fifth (c). That latter provision also gave the Company an option to call the stock in the event that an employee retired, died, or otherwise ceased employment with U.S. News. The value of the stock—both Class A and common—for purposes of Article Fifth was to be its "fair market value" "agreed upon by the parties," or as determined by an appraiser to be selected annually by the Board of Directors. *Id.* ¶ (e).[27] The appraiser was to render his annual valuations "without regard to the restrictions on transfer of stock contained in [the] Article[,]" using the "methods and standards recognized by the regulations of the United States Internal Revenue Service as appropriate for determining fair market value of corporate stock." *Id.* Article Fifth (g) further provided that the option price was payable in cash or in notes of up to 15 years' maturity, bearing 5 percent simple interest, and subordinated to other debts of the corporation.

As is readily apparent, the two controlling documents are not particularly illuminating on the question of whether the Company's stock—either Class A or common—was to be valued on a majority- or minority-interest basis. All that one learns upon reading the relevant provisions of the documents is that it was assumed that the Class A and common stock would be valued equally. If that fact had any significance in 1962, at the time the Company was reorganized, it was that the drafters of the documents contemplated that both classes of stock would be valued on a *minority-interest* basis. This appears to be so in view of the fact that, as of 1962, no shareholder, including the Plan, held more than a minority interest in the Company. Hence, had the Plan sold its holdings back to the Company at any time before 1971, when it became the majority shareholder, it would have been appropriate for it to have done so for a minority price.[28]

Finally, the fact that the fiduciaries charged with administering the Plan interpreted paragraph 6.3 of the Plan Document and Article Fifth (e) to require that the Class A stock be accorded the same minority value as the common stock was certainly not unknown to the Company's employees. Account statements and other documents given periodically to the employees made it reasonably clear that the annual appraisals ordered each year yielded a single per-share value, which was then used with respect to both the bonus and Class A stock. Indeed, no plaintiff testified that he was led to believe that there were in fact two such values. In short, the fiduciaries' interpretation of the relevant documents was not only consistent with the language of the Plan and its purposes,[29] but was consistently used and was understood by the Plan beneficiaries. *Carlough,* 576 F.Supp. at 249.

Recognizing that the Plan Document and Articles of Incorporation were drawn up

---

**27.** Throughout the history of the Company, it was the practice always to retain an appraiser, rather than to seek an agreement on the proper price. Article Fifth(e) did, however, afford employees the right, under certain conditions, to seek reappraisal of the stock. That provision was reprinted on the reverse side of the voting trust certificates issued to employee-shareholders in lieu of stock.

**28.** Noteworthy, too, is the fact that the Plan Document nowhere states that Plan members were to share ratably in the value of the *Company's assets* as a whole.

**29.** The extent to which the valuation of the Plan stock on a minority basis, by reference to Article Fifth, was consistent with the purposes of the Plan will be discussed further, *infra* pp. 1524 –30.

long before the enactment of ERISA, and noting too that, by the beginning of the Class period the Plan attained a majority position in the Company, it is necessary then to examine whether the continued valuation of the Plan's stock on a minority-interest basis violated ERISA as a matter of law.

### 3. Requirements of ERISA

ERISA, enacted in 1974, became effective as of January 1, 1975. The statute was designed to establish uniform, comprehensive and consistently applied protections for the beneficiaries of employee benefit plans. *See* ERISA § 2, 29 U.S.C. § 1001 (Congressional findings); 120 Cong. Rec. 29933–35 (1974) (remarks of Sen. Javits); *id.* at 29928, 29933 (remarks of Sen. Williams) (preemption of state law), *reprinted in* 1974 U.S. Code Cong. & Ad. News 4639, 5177, 5188–89. Congress' primary concern was with the financial soundness of the plans covered, the conduct of those administering them, and the fair treatment of their beneficiaries. Accordingly, the statute as enacted requires plan administrators to report on fund resources and activities to the Secretary of Labor and to employee beneficiaries, 29 U.S.C. §§ 1021–31; regulates participation and vesting requirements, *id.* §§ 1051–61, as well as plan funding, *id.* §§ 1081–86; outlines the responsibilities and establishes a standard of care for plan fiduciaries, *id.* §§ 1101–1114; and provides for the administrative, civil and criminal enforcement of its provisions, *id.* §§ 1131–1145.[30]

■ Despite the comprehensiveness of the provisions cited above, nothing in ERISA speaks to the amount or method of calculating benefits due plan beneficiaries. Rather, those determinations are left in the hands of the "private parties creating the plan." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981). Nevertheless, plaintiffs claim to have found in the body of the statute a firm directive that, in a case such as presented here, where a plan holds a majority block of employer stock, that stock must be valued on a control basis. For reasons that shall become apparent—and for ease of reference—that argument shall be called plaintiffs' "current value" theory.

It is noted at the outset that plaintiffs' "current value" theory is entirely a construction of counsel. It draws no support from any judicial or administrative interpretations of the provisions in question. The legislative history is sparse, and what little is found tends to undermine rather than to bolster plaintiffs' position. Indeed, as a simple matter of statutory construction, the theory is not in harmony with the legislative scheme as a whole, relying as it does upon the grafting together of various provisions and terms taken out of context. It is worth noting, too, that none of plaintiffs' several experts saw fit to refer to or rely upon the theory.

Plaintiffs begin by noting that ERISA § 103(a)(1)(A), 29 U.S.C. § 1023(a)(1)(A), requires every covered plan to file an annual report with the Secretary of Labor and to furnish that report to plan participants. Subsection (B) provides that the report shall include a financial statement detailing, among other things, what assets the plan holds. Subsections 103(b)(3)(A) and (C) require that the plan assets be listed at "current value." "Current value" is defined as "fair market value where available and otherwise the fair value as determined in good faith by a trustee or a named fiduciary ... pursuant to the terms of the plan ..., assuming an orderly liquidation at the time of such determination." *Id.* § 3(26), 29 U.S.C. § 1002(26). Believing that the phrase "orderly liquidation" somehow speaks to the issue of control valuation, plaintiffs seize upon a supposed difference in meaning between "fair market value" and "fair value," the latter implicating an "orderly liquidation."

Apparently, in plaintiffs' view, the "fair market value" of the Plan's stock would not involve the concept of "orderly liquidation," so that if it were acceptable under ERISA to value plan assets at fair market value, as the terms of the U.S. News plan

---

**30.** Subsequent sections of the statute govern multiemployer plans and plan terminations.

required, then the notion of an "orderly liquidation" would never enter into the calculus. Of course, plaintiffs cannot argue that ERISA proscribes valuations at "fair market value"; instead, they maintain that "fair market value" was not "available" within the meaning of the statute because the Company's stock was not publicly traded and that, hence, "fair value" must be used. As just noted, however, the documents under which the Plan was operated did prescribe a means of determining "fair market value"—either the parties would agree upon such a value or it would be arrived at by appraisal. The latter method, which was consistently used, is certainly endorsed by the Internal Revenue Service ("IRS") as appropriate for valuing and allocating trust earnings to a participant's account. *See* Rev.Rul. 80–155, 1980–1 C.B. 84, 85; Rev.Rul. 59–60, 1959–1 C.B. 237 ("fair market value" of closely held stock to be determined by appraisal); *see also Sommers Drug Stores Co. Employee Profit-Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456 (5th Cir.1986) ("fair market value" determined by appraisal for ERISA purposes), *reh. en banc denied,* 797 F.2d 977 (5th Cir.1986).

Other ERISA provisions cast further doubt upon the proposition that there is some qualitative difference between "fair market value" and "fair value." When a plan purchases or sells certain plan assets, it must do so for no more and no less than "adequate consideration." *Id.* § 408(e)(1), 29 U.S.C. § 1108(e)(1). "Adequate consideration" for this purpose means, where there is no "generally recognized market," the "fair market value of the asset *as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan....*" *Id.* § 3(18)(B), 29 U.S.C. § 1002(18)(B) (emphasis added). Clearly, the statute contemplates that "fair market

value" may in some instances be determined by appraisal, as was done in the instant case. The most that can be said for the distinction that plaintiffs attempt to draw between "fair market value" and "fair value" is that, if "fair value" means anything other than "fair market value," it is "fair market value by appraisal." And since a determination of "fair market value by appraisal" is precisely what was called for under the documents controlling the Plan, the concept of "current value" adds absolutely nothing to an analysis of how the Plan assets should have been valued.

Even if "fair market value" were not available or appropriate and if "fair value ... assuming an orderly liquidation" had to be determined, plaintiffs would gain nothing by it. The term "orderly liquidation" could mean either an "orderly *liquidation* " of a plan's assets—that is, the immediate sale of all of its assets in some "orderly" fashion—or it could mean an *"orderly* liquidation" of a plan's assets—that is, the sale of a plan's assets in whatever way is most appropriate, whether all at once or over a period of time. Hence, in no way can it be said that the phrase "orderly liquidation" requires that the Plan's stock have been valued on a control basis. If anything, it should counsel otherwise, for the "fair value" language upon which plaintiffs rely itself states that the value of a plan's assets should be arrived at considering the terms of the plan. All other relevant provisions of ERISA also make reference to and, in a sense, incorporate the provisions under which a plan is operated.[31] And since the terms of the U.S. News plan did not contemplate anything other than a series of minority-interest transactions, *see infra* pp. 1521–22, 1524 –30, the valuation of its stock on a mi-

---

**31.** ERISA leaves it to the plan to "specify the basis on which payments are to be made to and from the plan." *Id.* § 402(b)(4), 29 U.S.C. § 1102(b)(4). If the terms of payment specified in the plan are not complied with, a beneficiary may bring an action "to recover benefits due to him under the terms of his plan." *Id.* § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Sim-

ilarly, a plan fiduciary is required to discharge his duties "in accordance with the documents and instruments governing the plan," to the extent consistent with ERISA. *Id.* § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). If he does not, a beneficiary may bring an action "to enforce ... the terms of [his] plan." *Id.* § 502(a)(3)(B)(ii), 29 U.S.C. § 1132(a)(3)(B)(ii).

nority basis does not offend ERISA even under plaintiffs' "current value" theory.[32]

Finally, it should be noted that plaintiffs' "current value" theory is not consistent with ERISA's statutory scheme taken as a whole. First, it is not the purpose of ERISA to require that plan fiduciaries maximize the benefits paid to departing employees. *See, e.g., Edwards v. Wilkes-Barre Pub. Co. Pension Trust,* 757 F.2d at 56–57. If this were not the case, one would not expect to find, as one does, a requirement that an Employee Stock Ownership Plan ("ESOP")[33] that holds a controlling block of employer stock nevertheless value that holding on a minority-interest basis, if the employer's stock is actively traded. *See* Dep't of Labor P/Opinion 76–52 (1976) (applying ERISA § 3(18)(A)(ii), 29 U.S.C. § 1002(18)(A)(ii)). Nor would one expect to find an endorsement of a plan under whose terms "book value" was to be utilized in determining benefits. *See* Dep't of Labor P/Opinion 77–35 (1977). Second, the purpose that section 103 was meant to serve quite clearly has nothing to do with the calculation of benefits. Section 103 appears in the portion of the statute dealing exclusively with reporting and disclosure requirements. Those provisions, in turn, were designed to provide a means of overseeing plan administration. *See* 120 Cong. Rec. 29931–32 (1974) (remarks of Sen. Williams), *reprinted in* 1974 U.S.Code Cong. & Ad.News at 5185. The concern was with plans that, through mismanagement or outright criminal activity, become unable to pay the benefits to which their participants are entitled. *See* 120 Cong. Rec. 29934–35 (1974) (remarks of Sen. Javits); *see also Fink v. National Savings and Trust Co.,* 772 F.2d at 956–57. To this end, it is necessary that a plan not overstate the value of its assets when it files its annual reports. It is certainly consistent with that purpose that a plan which pays out benefits based upon a minority valuation of its holdings of employer stock should report the value of those holdings on that same basis. To report a greater value for them in its annual report would seem more repugnant to the statute. This would have been especially true for the U.S. News plan towards the end of the class period, when a large increase in the value of the Company's stock caused the Plan to experience some cash-flow difficulties.

To sum up, plaintiffs' "current value" theory not only lacks support in the text of the statute or in judicial or administrative glosses thereon, but it also is manifestly at odds with the entire scheme that Congress had in mind. The theory must be, and is, rejected outright.

### 4. Reasonableness of the Appraisal Methodology

Neither ERISA nor the documents under which the Plan operated provide any affirmative directive as to how the Class A stock should have been valued. It therefore becomes necessary to determine whether, within the relatively loose constraints imposed by the statute and the operative documents, the assumptions relied upon and the procedures utilized by the appraisers were reasonable under the circumstances. Plaintiffs of course bear the burden of proof on the valuation.

Plaintiffs of course bear the burden of proof on the valuation issue; nevertheless, it is useful first to canvass the situation briefly from defendants' perspective. Such an overview demonstrates the *prima facie* reasonableness of defendants' approach.

---

**32.** It should be noted that section 103, which contains the requirement that assets be listed at "current value," applies as well to defined benefit plans. Yet the terms of a defined benefit plan, as the name suggests, provide that a specific amount of benefits be paid out, not an amount dependent upon a formula that, in turn, must—under plaintiffs' theory—incorporate the notion of "current value." *See* ERISA §§ 3(34), (35), 29 U.S.C. §§ 1002(34), (35). Hence, it is far more probable than not that the term "current value" has nothing whatever to do with the calculation of plan benefits.

**33.** An ESOP is a specific type of employee benefit plan recognized under the Internal Revenue Code ("IRC"). While the U.S. News plan shares many features in common with an ESOP, it does not meet the statutory definition that would qualify it under the Code. *See* ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6); IRC §§ 401, 409, 26 U.S.C. §§ 401, 409.

### a. Defendants' Perspective on Methodology

■ Defendants' valuation methodology produced a result that was consistent with the provisions of the operative documents. The appraisals arrived at a single, minority value that was reasonable as applied to the minority transactions featured by both the profit-sharing and stock bonus plans. The redemption of the bonus stock each year clearly involved the exchange of small amounts of stock, whose owners had no direct effect on or say in the day-to-day operations of the Company, either in theory or in practice. Participation in the Plan afforded its beneficiaries an even more remote interest in the affairs of the corporation, to the extent that the Plan served as a holding device for shares of stock that the employees themselves did not directly own. As will be seen, there is no reason to look beyond the practical realities of how the Plan functioned and to assume that it could exercise theoretical powers that would have served to enhance the value of plaintiffs' minority interests. *See infra* pp. 1524–30.

Even if a cogent argument could be made to support a control valuation of the Class A stock, it is impossible to say that what defendants did was unreasonable. Clearly, in the absence of any statutory, administrative, or judicial authority for the proposition that a control value might have been indicated, defendants cannot be faulted for employing a minority valuation. As noted, ERISA does not require plan fiduciaries to maximize the benefits of departing employees, *Edwards v. Wilkes-Barre Pub. Co. Pension Trust,* 757 F.2d at 56–57; it only requires them to make a reasonable choice from among possible alternatives. *Stewart v. National Shopmen Pension Fund,* 795 F.2d at 1083. Again, as stated at the outset, no principle of law governing this litigation demands that monies received from the 1984 sale be distributed to former employees without regard to fault on defendants' part in valuing the Company's stock during the class period. And defendants cannot be faulted for choosing one from at most two reasonable alternatives.

### b. Plaintiffs' Perspective on Methodology

In addition to "current value," plaintiffs advance three theories as to why the Class A stock should have been valued on a control basis. They first argue that, because the Class A stock—as well as the common stock—was placed in the voting trust, they acquired the equivalent of a controlling interest by operation of law. They then argue that, because—as they allege—the Plan originally paid a control price for its stock, principles of consistency require that Plan beneficiaries be awarded benefits on a control basis as well. Finally, they maintain that the very fact that the Plan held a majority of the outstanding stock by itself dictates that a majority-interest approach should have been used. The three theories will be discussed in that order.

#### i. The "voting trust" theory

■ Plaintiffs believe that, although they were not entitled to vote their shares of stock, those shares should have been valued on a control basis. The fact that such "control" resided in individuals over whom they in turn had no control, they say, afforded them the benefits of control by operation of law. Moreover, that theory, if accepted, would require that plaintiffs' minority holdings of common stock, as well as the Plan's Class A stock, be valued on a majority-interest basis.

As defendants have been quick to point out, the theory has no basis in theory or in practice. First, the voting trust did not, and was not meant to, afford U.S. News employees a controlling voice in the Company. Indeed, the voting trust instrument states on its face that it was designed only to provide employees with "beneficial ownership" of shares of U.S. News stock—that is, with something less than the full incidents of stock ownership. Moreover, plaintiffs were under no misapprehension as to what Mr. Lawrence intended and had accomplished. As he made clear both when the Company was reorganized in 1962 and subsequently, he still held the reins of control. Plaintiff Charles Foltz recognized this when he testified that Lawrence "took

part in virtually everything from top to bottom." 1 Tr. 161. As Chairman of the Board, Chief Executive Officer, and "owner,"[34] Lawrence "had the final say on virtually everything that took place in the publication." *Id.* It is undisputed that he alone voted the stock, just as he had done prior to the reorganization.

After Lawrence's death, when the voting trust agreement came up for renewal, his successor, John Sweet, sent a memorandum to the employees, recommending that they vote to renew the trust. Sweet made it clear in his memorandum that the purpose of the trust was to "concentrat[e] responsibility, authority, and accountability." DX 141 at 4, 7. This was what Lawrence had in mind when he effected the reorganization of the Company, and it is certainly the way that business was conducted during the class period.

Despite the realities of how the voting trust actually worked and of how corporate control was concentrated, first in Lawrence and then in his successor trustees, plaintiffs continue to argue that, because the trustees owed them fiduciary duties to run the Company in their best interests, the voting trust provided a mechanism whereby employees enjoyed effective control of U.S. News. Such an argument, however, simply proves too much. It is always the case that the directors and officers of a corporation manage the company for the benefit of its shareholders and that they owe those shareholders fiduciary duties to manage the company in an acceptable manner. *See* 8 Del.Code Ann.: Gen.Corp.Law § 141(a) (Michie 1983); *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985); *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984); *Gottlieb v. McKee,* 34 Del.Ch. 537, 107 A.2d 240, 243 (1954); *Harden v. Eastern States Pub. Serv. Co.,* 14 Del.Ch. 156, 122 A. 705, 706 (1923); *see also Matter of Reading*

*Co.,* 711 F.2d 509, 517 (3d Cir.1983).[35] A voting trust adds nothing to a shareholder's rights in this regard, but rather takes away from him the right to vote his stock on certain issues. As to certain other issues, such as mergers and other major corporate changes, the vote of a majority of the beneficial owners of the Company's stock was required. In that situation, then, the voting trust was inoperative. In short, as to day-to-day matters of corporate management, the voting trust added nothing to a shareholder's rights. As to major corporate undertakings, it only gave him back rights that he would normally have retained in the absence of the trust. In no way did the voting trust serve to enhance the power enjoyed by a minority shareholder of the Company.

Under the tax authorities made relevant by Article Fifth, it is well recognized that, not only does the existence of a voting trust fail to make the underlying stock more valuable, it most often decreases the value of those shares. Decisions from the Tax Court amply support the notion that stock stripped of its voting rights is worth less than stock that can be voted. *See, e.g., Estate of Zaiger v. Commissioner,* 64 T.C. 927, 945–46 (1975), *acq.,* 1976–1 C.B. 1; *Estate of Reynolds v. Commissioner,* 55 T.C. 172, 190–94 (1970). For that reason, defendants would have been justified in reducing the value of the Company's stock to reflect the impediment that the trust placed against the full enjoyment of the rights that would ordinarily have attached to the stock. In conclusion, it is noted that plaintiffs have produced absolutely no relevant authority for the contrary proposition that they seek to have the Court endorse.

It almost goes without saying, then, that there is no basis for plaintiffs' assertion that their common stock should have been

---

**34.** It is unclear whether Mr. Foltz was describing Lawrence's pre-reorganization role or using a shorthand to describe his post-reorganization activities. At neither time was Lawrence actually the "owner" of the Company, although at both he was the sole voting trustee and firmly in command. As Don Harris, U.S. News general counsel during the time, testified, Lawrence was a "very strong executive." 57 Tr. 11034–35.

**35.** Delaware law governs questions concerning the corporate governance of U.S. News, under applicable conflicts of law principles. *See Restatement (Second) Conflict of Laws* §§ 302(b), 304, 306, 309 (1971).

valued on a majority-interest basis. They have put forward no theory to support such a valuation, under applicable IRS standards,[36] that does not depend upon a finding that the Class A stock should have also been valued on a control basis. Indeed, during closing arguments, the common stock was all but lost sight of. *See* 74 Tr. 14,124–25.

### ii. The "consistency" theory

■ Plaintiffs' "consistency" theory derives its inspiration from the testimony of Mr. Paul Much, one of defendants' experts. Much testified that, where a plan pays for its holdings of employer stock on a control basis, it should also pay out benefits on a control basis, even if it no longer holds a controlling interest in the employer company. *See* 54 Tr. 10,418–23, 10,472–75; 55 Tr. 10,718–20. He bases his position on the notion that, where a plan pays a premium for stock purchased on behalf of a group of employees, those employees should get the benefit of that premium value. After reading Much's pretrial report, Mr. John Hempstead, plaintiff's expert, came to the conclusion that this theory could be useful for plaintiffs if they could show that the Plan made its purchases of U.S. News stock in 1962 and 1966 at a control price, based upon the May 1962 and December 1965 appraisals.

A brief discussion of those appraisals best demonstrates the risk one faces in relying on the theory.

### The May 1962 appraisal

In its language, if not in its methodology, the May 1962 appraisal, DX 357, is unfortunately a study in ambiguity, as Mr. Much testified at trial. *See generally* 54 Tr. 10,-433–69; 55 Tr. 10,700–18, 10,730–58. The report begins by announcing that the value determined was of "the entire business enterprise of [U.S. News Publishing] *as a going concern....*" DX 357 at 3 (emphasis added). Plaintiffs, of course, focus on

the language "entire business enterprise" and leap to the conclusion that a control value is being provided. On the other hand, the greater portion of the experts who testified at trial associated "going concern" value with minority value—that is, the value of a business as it continues in existence, not as it is liquidated. In light of the report as a whole, the most sense that can be made out of the quoted phrase is that American Appraisal valued the entire business on a minority basis. Such a value would represent the aggregate of all minority interests in the company, in the same way that one might multiply the current "bid and asked" price of a publicly traded corporation by the number of outstanding shares.

Other ambiguities in the language of the report crop up, but all can be similarly resolved. For instance, after going through a "market comparable" analysis—whereby an appraised price is determined by reference to the prices at which comparable, publicly-owned companies are traded—the report appears to draw a curious distinction. It states that while current publicly traded prices are "pertinent," "day to day fluctuations in the security markets are not such as to be controlling in the valuation of an entire business, as such fluctuations are only for minority stock holdings in the comparatives used." DX 357 at 18–19. The lesson to be borne in mind, apparently, is that the "rather drastic reduction in quoted prices" of the comparable companies was to be given less weight in arriving at the value of the "entire equity" of U.S. News, whose recent trends in growth had been positive. *Id.* at 20. As Mr. Much conceded, this language is indeed ambiguous or seemingly contradictory. Still, a fair reading seems to be that, in valuing the entire business of a company—albeit, on a minority basis—one is more concerned with arriving at a stable

---

**36.** The *Richardson* plaintiffs' expert, Mr. Martin J. Whitman, testified that he viewed an appropriate appraisal of the Company's stock as borrowing from statutory appraisal practices developed under state corporation law, practices which represent a departure from the way in which minority shares are viewed under the tax

authorities. *See* 43 Tr. 8537; 44 Tr. 8735–45. Yet the valuation clause of Article Fifth points to IRS regulations and standards, not to something else. To the extent that that clause is valid—and it is—there is no reason to accept Mr. Whitman's substitution of his methodology for that followed by American Appraisal.

value than if one were valuing only an individual minority parcel that might be bought or sold on a day-to-day basis.

The most compelling reason for ignoring the ambiguities in the language of the report is that the purpose of the appraisal was quite clear. The determination of a single value was needed in order to provide a fair price for each of four related transactions: (1) the exchange of shares between U.S. News Publishing and U.S. News; (2) the purchase (from members of the Lawrence family) of U.S. News Publishing shares by U.S. News; (3) the purchase of U.S. News Class A stock by the Plan; and (4) the sale by the Lawrence family of their shares of U.S. News Publishing to U.S. News. DX 357 at 3; *see also* PX 1107 at 10 (request for IRS advance determination letter). As Mr. Much testified, all of these were minority transactions, including the Plan's purchase of its 30,000 shares of Class A stock. Indeed, as U.S. News' general counsel Don Harris stated, the purpose of the valuation was to arrive at a single, minority price that would serve equally well for each of the four purposes outlined. 57 Tr. 11,096–98. Moreover, because the Plan did not actually acquire control, Mr. Harris believed it would have been inappropriate under IRS standards for the Plan to have paid a control premium for a minority block.[37] *See* 57 Tr. 11,061, 11,065–66. If, indeed, such a price had been paid, it would have been an unwanted surprise, for the Plan might have lost its tax-qualified status.

One final ambiguity is the reference in the May 1962 report to the 1961 sale of a controlling interest in Newsweek, Inc. to The Washington Post Company for $50 per share. Ordinarily such reference would be meaningful only in the context of a control valuation. Its inclusion appears to have been motivated by Mr. Lawrence's conviction that his magazine was worth at least as much as Newsweek and his insistence that some reference be made in the report to the Newsweek sale. *See* 59 Tr. 11,338–41 (Harris); 3 Tr. 432 (director-defendant Samuel Keker). In fact, as the analysis of the Newsweek sale reveals, U.S. News was apparently worth more—on a control basis—than the $50 per share or $15 million indicated for Newsweek and as a final conclusion of value for U.S. News.[38] Finally, American Appraisal did not undertake the kind of analysis of asset values that one normally expects to accompany a control valuation, nor did it seek to apply a control premium to the value that it obtained from the market comparable approach. In short, the reference to the Newsweek sale at most appears designed to support a minimum minority value of $15 million, which was the value finally determined for U.S. News.[39]

### The December 1965 appraisal

There can be little doubt that the December 1965 appraisal, DX 363, was performed on a minority-interest basis. The appraisal methodology was the same as that used during the class period, in that it arrived at a per-share value by reference to the prices at which the stock of comparable publicly-owned companies traded. Unlike some of the later appraisals, however, it gave no consideration to the value of the Company's underlying assets, rendering it an even "purer" minority appraisal.

Concentrating on the language of the reports, again, plaintiffs point out something that they think is in their favor. The appraisal reports through that of December 1964 state that the valuations arrived at therein gave "no consideration … to the relative value of minority holdings, which

---

**37.** Today, under ERISA, it would be similarly improper for a Plan to pay more than "adequate consideration" for a block of employer stock. *Id.* § 408(e)(1), 29 U.S.C. § 1108(e)(1); *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

**38.** Mr. Much testified that, if American Appraisal had used the Newsweek data to arrive at a *control* value for U.S. News, such a value would have been more on the order of $24 million.

**39.** As noted, the $15 million works out to a per share value of $50. That value, in turn, was the same as the December 1962 value and less than the values in each subsequent year. And since the latter valuations were quite clearly done on a minority basis, it follows that the May 1962 price of $50 per share was a minority price.

usually have a lesser Fair Market Value than the business as a whole." This means, plaintiffs say, that the valuations were all done on a control basis. Interestingly enough, however, the December 1965 report states only that "consideration ... *may* be given to the relative value of minority holdings...." DX 363 at 2 (emphasis added). If the change is significant, it certainly does not cut in plaintiffs' favor.

Yet the change in the language, indeed the language itself, is of little, if any, significance. Every report rendered by American Appraisal was indeed a minority report, as is clear from the methodology employed. While some reports do state that "no consideration" is to be given to the lesser values of minority shares, that disclaimer apparently meant only that no further discount from the minority price arrived at through the market comparable analysis was to be taken to account for the fact that smaller blocks of stock tend to be less attractive to investors. Mr. Harris testified that this is what was in his contemplation from the time of the earliest appraisal. He stated that what was sought was a "basic" valuation—done on a minority basis—with no further adjustment based upon the size of the individual blocks being valued. In his mind, "minority discount" meant a discount applied to a minority block of stock to reflect not its lack of control, but its relative lack of marketability. He understood that the prices arrived at through a market comparable analysis were themselves minority prices. *See* 57 Tr. 11,123–24; 59 Tr. 11,355. In other words, by "minority discount" he simply meant "marketability discount," a discount which was not applied to the U.S. News stock until 1975.[40] Although it is unfortunate that he mixes the terminology somewhat, his understanding of the process is perfectly accurate. *Cf.* Fellows & Painter, *Valuing Close Corporations for Federal Wealth Transfer Taxes: A Statutory Solution to the Disappearing Wealth Syndrome,* 30 Stan.L.Rev. 895, 921 n. 89 (1978) (some confusion exists over the difference between minority and marketability discounts).

Harris went on to testify that the language was changed, effective with the 1965 report, in order to avoid any appearance that American Appraisal failed to take into account any relevant factor. 58 Tr. 11,243. The American Appraisal representative who did the December 1964 appraisal (and did it on a minority basis), Mr. John E. Hossack, testified that he was confused over the "no consideration" language and thought it possibly inappropriate. He questioned U.S. News about the matter, which in turn referred it to Mr. Harris. *See* 7 Tr. 1254–66; 9 Tr. 1695–96. Harris suggested that the language be changed to read "consideration ... may be given," PX 184, and U.S. News passed the suggested language on to Hossack. Hossack then used that language in the December 1965 report, which he prepared, as he testified, on a minority-interest basis. PX 688; 8 Tr. 1600–02; *see also* 7 Tr. 1435–36; 8 Tr. 1582.

There is absolutely no reason for this Court to disbelieve the testimony of Mr. Hossack, who prepared the 1965 report, and to find that, contrary to all appearances, it was really a control valuation. Indeed, it is most surprising to find plaintiffs arguing that it was a control report, when it is substantially similar both in methodology and in language[41] to the reports rendered during the class period. Finally, as in 1962, the Plan did not acquire a controlling interest in the Company by virtue of its 1966 purchase of an additional

**40.** Beginning with the December 1978 report, the language was again changed to read "consideration ... *is* given to the relative value of minority holdings." DX 374 at 2 (emphasis added).

**41.** As noted, the methodology used in the 1965 report was an even "purer" minority-interest methodology than that used in reports performed during the class period. Similarly, as pointed out, *supra* p. 1522, it was not until 1978 that the language was changed to read "consideration ... is given." Hence, the language in the reports rendered during the class period, but prior to 1978, was identical to that in the 1965 report. If that language by itself denotes a control valuation, then plaintiffs' claims accruing during the first half of the class period must fail by plaintiffs' own admission.

20,000 shares of Class A stock. Hence, for reasons previously stated, it is highly unlikely that it would have paid a control premium for those shares.

Because the Plan did not, in fact, pay a control price for any of its 50,000 shares of Class A stock, it is not necessary to further probe the merits of the "consistency" theory.

### iii. The "control block" theory

■ Plaintiffs' "control block" theory holds, simply, that because the Plan held a majority of the Company's outstanding shares, its holdings should have been valued on a control basis. To some extent, it draws support from Rev.Rul. 59–60, which indicates that the size of the block of stock to be valued is one consideration to be weighed in the balance. *Id.* Sec. 4.01(g), 1959–1 C.B. 239. Plaintiffs go further, however, and appear to argue that it is *the* factor to consider and that the number of shares that happened to have been deposited with the Plan is determinative of how those shares should have been valued.

The parties agree, and the relevant tax authorities hold, that the "fair market value" of property such as the Plan's stock is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treas.Reg. § 20.2031–1(b), 26 C.F.R. § 20.2031–1(b). This formula was recited, or at least paraphrased, in the annual appraisals, beginning with the May 1962 report. While this formulation has long had wide application to all aspects of federal taxation, *U.S. v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), it appears within the portion of the IRS regulations dealing with the valuation of property for estate tax purposes. That fact must be borne in mind in looking to tax authority for guidance in determining how the Company's stock should have been valued. It must also be remembered that, while Article Fifth establishes that tax authority controls questions of valuation arising thereunder, this is not a tax case. Moreover, the directive to look to tax law is subject to ERISA's mandate that employee benefit plans be operated in such a way as to effectuate their essential purposes. In short, while tax principles in general, and estate tax principles in particular, are implicated in a valuation of the Plan's stock, this is not a case in which—at the valuation dates in question—property was to change hands. Therefore, the teachings of the relevant authorities must be applied with some degree of circumspection.

Returning to the "willing buyer/willing seller" formulation, the important question is how to apply that test to a situation in which individuals, who are members of an entity holding a majority block of stock, are paid cash benefits based upon the appraised value of that stock. The question becomes "Who was buying and selling what?"—and it is not an easy question to answer.

Defendants start from the premise that the Plan was not a holder of stock, much less of control, but rather was only a mechanism that enabled employees, who could not otherwise have afforded to buy out the Lawrence family's holdings, to acquire beneficial ownership of the Company. That view is amply supported by the testimony of Mr. Harris, who helped devise the plan for reorganization. *See* 59 Tr. 11,318–19, 11,345–46. It is also supported by the testimony of Mr. Much, who stated that the economic reality underlying the Plan was that its participants were something less than minority shareholders, who liquidated their individual interests in the Plan in a series of minority transactions. *See* 54 Tr. 10,416–18, 10,475–77.

Plaintiffs argue, however, that regardless of the manner in which participants settled their Plan accounts, the Plan itself held an "asset" in the form of a majority block of U.S. News stock. Since that block entitled the Plan to exercise control of the Company—for which a "willing buyer" would pay a premium—each Plan participant, they maintain, should have shared ratably in a control valuation of that "asset."

While that argument has a surface appeal, it also suffers from two fatal defects. First, just as the "current value" theory, it confuses the valuation of a plan's assets for purposes of determining the solvency of the fund from which benefits are to be paid, on the one hand, with the determination of the level of benefits to be paid according to whatever formula the terms of the plan provide, on the other. The two are not necessarily the same. Moreover, even if the Plan's 50,000 shares were to be valued as a discrete "asset" for the purpose of determining benefits, the valuation of those shares on a minority basis was perfectly reasonable under the circumstances.

Essential to an application of the "willing-buyer/willing-seller" test is the perspective from which the property is being viewed. In estate tax cases, the interest is valued "at the time of the decedent's death...." Treas.Reg. § 20.2031–1(b), 26 C.F.R. § 20.2031–1(b). Nevertheless, there is some confusion as to whether one views the interest as it existed in the decedent's hands, see, e.g., Estate of Curry v. United States, 706 F.2d 1424, 1427 (7th Cir.1983); Fellows & Painter at 918 n. 82, or at some metaphysical mid-point after the decedent's demise, but before his interest vests in the legatee. See Estate of Bright v. United States, 658 F.2d 999, 1001 (5th Cir.1981) (en banc). The distinction becomes important in situations where the property is worth more (or less) in the hands of the transferor than in those of the transferee.

Both Curry and Bright involved situations in which the property being valued might have been worth more if viewed solely from the decedent's perspective or from the legatee's perspective after the interest passed.[42] The holdings of both Curry and Bright can be reconciled with each other when one considers that neither court relied upon what either the decedent or the legatee might have done with his or her interest, but rather focused upon what a *hypothetical* "willing seller" would have sought to do and what a *hypothetical* "willing buyer" would have accepted.

Hence, in *Curry*, the court looked to the way in which such parties would have sought to maximize their own utility from a hypothetical arm's-length sale. 706 F.2d at 1428–29. Similarly, the *Bright* court examined the value to such hypothetical parties of the interest that passed at death, not the interest that existed prior or subsequent to that passing. 658 F.2d at 1005–07.

Still, even when one restates the "willing-buyer/willing seller" test as above, so as to make it more relevant to non-estate tax cases, the test remains somewhat inapplicable to the present situation. It seems to be inconsistent with ERISA's requirement that a plan be managed according to its terms to substitute for the plan a "hypothetical willing seller." In other words, a strict application of the *Bright* formulation would require the Court to inquire only into what a hypothetical seller would do with the Plan stock, not what the Plan fiduciaries would have done after considering what was in the best interests of the Plan and its beneficiaries under the particular circumstances in question. Hence, to the extent that the valuation clause of Article Fifth must be read consistently with ERISA, the appropriate test for assessing the valuation of the Plan's stock should be whether that valuation is consistent with the administration of the Plan according to its terms. That restatement of the test, moreover, does not represent a great departure from tax valuation principles. When applying the "willing-buyer/willing seller" test, a court may consider the "actual facts" impinging upon the value in question, *Estate of Andrews v. Commissioner*, 79 T.C. 938, 956 (1982), as long as the court does not give way to consideration of the "subjective intention" of the parties. *Curry*, 706 F.2d at 1431. *See also* Dep't of Labor P/Opinion 77–78A (1977) (actual intention relevant to valuation under ERISA).

To be sure, if the Plan were to have sold its holdings to a third-party, as it did in 1984, it would have been entitled to a control price for its shares. While such a sale could have taken place during the class period, it is also the case that the Company

**42.** The facts of *Bright* and *Curry* will be discussed in more detail, *infra.*

could have exercised its option to call the shares, blocking any sale to an outsider. In such a situation, it is not clear that the Plan would have been entitled to a control price from U.S. News, for reasons that will be discussed shortly. Similarly, if the Plan declined, as it did during the class period, to sell its holdings, it is even more doubtful that it would have been appropriate to value its holdings at a premium representing "control" that it did not in fact exercise. Defendants' expert Mr. Shannon Pratt pointed out that such a valuation could have resulted in an improper dilution of the interests of participants who remained in the Plan. Specifically, persons leaving the Plan would have received benefits based upon value in the Plan that was not to be realized. Insofar as payment of such benefits would have drained cash from the Plan, the Plan might have been forced to sell off parcels of stock at a minority price,[43] which would have left remaining participants receiving less per share so that departing participants could be paid more. *See* 62 Tr. 11,969–70.

The reason why the Plan most likely could not have obtained a control price for its shares from U.S. News is that, by buying back those shares, U.S. News would not be buying "control" of itself and, hence, would not have been willing to pay a control premium. Thus, such a situation would have been different from that in which a corporation buys back shares from a shareholder or control group that actually does exercise control. In that situation, the corporation might be willing to pay a premium in order to dissolve the control previously exercised by the seller.[44] The Plan, however, was not a controlling shareholder, despite its majority holdings.

What constitutes "control," such that a purchaser of a majority block of shares would be willing to pay a premium for them, is best summarized by Chester Gougis, one of defendants' experts. *See* 68 Tr. 13,135–37. Mr. Gougis stated that the benefits of control are threefold. First, the purchaser of control may be able to run the acquired company together with his other businesses in such a way as to increase overall efficiency—to achieve "synergies" of operation. Second, the purchaser might be able to access the cash reserves or other resources of the acquired corporation, for use in a way that he deems especially useful. Finally, a controlling shareholder is able to choose a management team to run the corporation consistent with policies that are agreeable to him. The first two factors primarily speak to the question of whether a purchaser will pay a control premium for a majority block of stock. In the case of a purchase of the Plan's holdings by U.S. News, it is clear that the Plan could not offer the Company any "synergies," cash or resources that the Company did not already have. The third factor speaks as well to what the controlling shareholder can do within the corporation itself. As holder of a majority block of U.S. News stock, the Plan could do almost nothing in this regard.

It is undisputed that, throughout the class period, the Plan did not exercise "control" of the Company in any sense of the word. U.S. News was managed by its directors, who incidentally appointed the Profit-Sharing Committee. The Profit-Sharing Committee was comprised of two directors and two other "lay" employees. The director members of the Committee certainly did not—and were not required to—attempt to manage the Company differently as Committee members than as directors.[45] For its part, the Plan as "ma-

---

**43.** Of course, it could be argued that in such a situation the Plan could have simply sold out its holdings at a control premium. Yet nothing in ERISA requires that a plan function in such a way that it must liquidate itself after a given period of time. Indeed, as noted earlier, the driving force behind the enactment of ERISA was a concern that plans should remain solvent.

**44.** Indeed, to fend off a tender offer, a corporation might be willing to pay a premium for *minority* blocks of stock.

**45.** ERISA specifically permits the appointment of corporate officers and directors as plan fiduciaries. *Id.* § 408(c)(3), 29 U.S.C. § 1108(c)(3). As long as no conflicts of interest arise, such a fiduciary may continue to serve in a dual capacity. *See Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.1982).

jority shareholder" did not have any say in the management of the Company. For one thing, its status as "majority shareholder" would have become relevant, under the terms of the voting trust, only with respect to extraordinary corporate events requiring a majority vote of the beneficial owners of the stock. And even in the event that such a matter would have come to a vote, there is no reason to expect that those entitled to so vote the Plan's shares—that is, the Committee—would have voted otherwise than using the same best judgment that they employed as directors. As for the other two Committee members, whose function it was to tend to the more ministerial aspects of Plan administration, nothing in ERISA would have required them to second-guess the directors in matters of corporate management. *Cf.* ERISA § 405(c)(1), 29 U.S.C. § 1105(c)(1) (plan may allow named fiduciaries to delegate certain responsibilities among themselves or to others). In short, the Plan did not function as a control entity within the Company, and its fiduciaries were not required to set themselves up as a second board of directors. Rather, the Plan and its fiduciaries functioned exactly as it was contemplated that they would. As Mr. Harris testified, it was never meant that the Plan be a "shareholder" of the Company as such; it was only to be a conduit for the beneficial ownership of U.S. News by its employees.

A question remains, however, of whether the Plan *could* have exercised "control" of the Company in some meaningful way. It has already been established that the Plan was not a ready instrument for toppling existing management. Certainly, members of the Board were not about to depose themselves, and any replacements would have been voted in by the voting trustees, themselves members of the Board, rather than by the Profit-Sharing Committee.[46] Even assuming, however, that the Committee could have set itself up apart from the Board, it is not clear that such an arrangement would have advantaged Plan beneficiaries to any extent.

Such an "independent" Committee could have only acted independently with respect to extraordinary corporate matters, matters in which it could have used its majority vote. If the Company were to remain employee owned, the Plan would have been limited to attempting to secure for itself and its beneficiaries a greater share of the corporate assets.[47] Yet while this sounds like a plausible course of action in theory, its implementation would likely have run afoul of Delaware corporation law. Under Delaware law, a majority shareholder, to the extent that it can make its power felt, is under a duty not to act to the detriment of minority shareholders. *See, e.g., Matter of Reading*, 711 F.2d at 517; *Harriman v. E.I. DuPont de Nemours & Co.*, 372 F.Supp. 101, 105–06 (D.Del.1974); *Weinberger v. UOP, Inc.*, 409 A.2d 1262, 1265 (Del.Ch.1979). Similarly, under ERISA, a plan fiduciary who is also a director or majority stockholder owes fiduciary duties as well to non-plan shareholders. *Donovan v. Cunningham*, 716 F.2d at 1473 n. 38. Hence, there might have been significant legal impediments to the Plan's at-

---

**46.** While it is true that the Plan could have used its majority vote to terminate the voting trust, it is also true that the board of directors could remove members of the Committee without cause. Hence, it is unlikely that the Plan Committee, under any scenario, would have been in a position to oust the current management, which would have likely meant ousting themselves.

In addition to not being in a favorable position to vote in new management, the Committee could not have acted to limit, by formal agreement, the discretion of the directors in managing the Company. *See Abercrombie v. Davis*, 35 Del.Ch. 599, 123 A.2d 893, 898–900 (1956), *rev'd on other grounds*, 36 Del.Ch. 371, 130 A.2d 338 (1957); *see also Chapin v. Benwood Foundation,*

*Inc.*, 402 A.2d 1205, 1210–11 (Del.Ch.1979), *aff'd,* 415 A.2d 1068 (Del.1980).

**47.** The theory that the Plan could acquire additional assets from the Company was put forward by counsel for the *Richardson* plaintiffs, and was probably inspired by a 1981 draft report from U.S. News counsel suggesting that one way to deal with the Plan's "liquidity crisis" would be to divide U.S. News and Madana into two separate corporations and give the Plan an 80% holding in Madana. *See* PX 524 at 19–21. Assuming that that arrangement would have met applicable legal standards, it still does not lend support to a theory that the Plan could have willy-nilly gobbled up the assets of U.S. News "Pac-Man"-style.

tempted appropriation of additional assets.[48]

If the Plan choose to force a sale or merger of the Company, of course, it would have been able to realize some or all of the value in its stockholdings, but only with the cooperation of the Board. First, if the Plan attempted to sell its shares to an outsider without prior Board approval, the Company could have called the shares and would probably not have had to pay a control price for them. Second, if the Plan desired to sell off the Company's assets or otherwise dissolve or liquidate the corporation, it could not have moved in that direction without Board initiation of such a plan for sale or dissolution. *See* 8 Del.Code Ann.: Gen.Corp.Law §§ 271, 275(a) (Michie 1983 & Supp.1986). In short, there was really nothing the Plan could have done on its own to enjoy or realize control of the Company. Therefore, there is no reason why its shares should have been valued on the premise that the Plan could have exercised such control.

Finally, even if the Plan could be said to have enjoyed control of U.S. News, it does not follow that its members should have shared ratably in a control value, merely because they owned "undivided" interests in the Plan assets. The cases cited to the Court do not support the proposition that an undivided fractional interest in a control block of stock should be valued on a control basis. In *Bright*, discussed earlier, the decedent and her husband each owned an undivided one-half interest in majority blocks of stock in several corporations. The stock was held jointly as community property under state law and was subject to partition at the death of one of the spouses. The decedent left her one-half interest to a trust for the benefit of her children, naming her husband as trustee. In valuing the decedent's interest for estate tax purposes, the court refused to hold that those holdings constituted one-half of a control block of stock. The court reasoned that decedent's interest could not be aggregated with that of her husband on the basis that they held the stock jointly during their marriage, for the fact of death terminated that joint ownership. 658 F.2d at 1002–07. More importantly, her interest could not be so aggregated with her husband's after death, even though he might not have been willing to sell either the shares he held in trust or his own shares individually, thus foregoing a receipt of a control price. *Id.* at 1005–07. Instead, the decedent's interest had to be valued standing alone, and standing alone it was only a minority interest. *Id.*[49]

---

**48.** While an employee became a participant in the Plan before he was entitled to become a holder of bonus stock, his Plan interest vested some years *after* his acquisition of common stock. Hence, there were holders of common stock who did not have vested interests in the Plan. Therefore, there was at least in theory the possibility that, under certain conditions, the interests of profit-sharing and stock bonus plan participants might have diverged.

In addition to the impediments imposed by fiduciary duties owed to the non-Plan stockholders, the limit on maximum contributions to a qualified employee benefit plan might have prevented the Plan from acquiring additional assets from the Company. *See* IRC §§ 401(a), 404(a)(3)(A), 415(a)(1)(B), (c), 26 U.S.C. §§ 401(a), 404(a)(3)(A), 415(a)(1)(B), (c).

Finally, any transfer of corporate assets would have likely required Board approval under Delaware law. *See* 8 Del.Code Ann. § 141(a); Article Tenth, U.S. News Articles of Incorporation.

**49.** In *Propstra v. United States*, 680 F.2d 1248, 1251–53 (9th Cir.1982), the court similarly held that an undivided one-half interest in real estate should be valued standing alone. And in *Estate of Andrews*, 79 T.C. at 954–56, the court declined to hold that a minority interest in several family-held corporations should be accorded a pro-rata control value based on the analogous "family attribution" doctrine, whereby the separate interests of family members are aggregated on the theory that the family as a whole exercises control.

In *Estate of Curry*, the court did rule that the decedent's holdings of non-voting stock should have been valued equally with his control block of voting stock as a matter of law and that the district court's failure to give such an instruction to the jury was prejudicial error. 706 F.2d at 1427–30. The court reasoned that, because the decedent *himself* had overall control, his additional shares of non-voting stock should not have been considered apart from his control block because no "willing buyer" would have purchased them separately. The case does not stand for the proposition that a separable, minority position in a majority block of stock should, if valued separately, be accorded a pro-rata control value.

Admittedly, the determinative factor in the *Bright* court's ruling could be said to have been its concern that decedent's interest be valued at the moment of death or partition, not before when the decedent and her husband jointly held the stock, nor after when Mr. Bright served as trustee of decedent's shares in addition to retaining his own shares. In the present case, however, we must deal with a situation in which, on the valuation date in question, various individuals concurrently held undivided, minority interests in a majority block of stock. In this way, the situation appears to be more like that of Mr. and Mrs. Bright before the latter's death. However, if before the death of Mrs. Bright, her interest could have been valued—for some purpose—on a pro-rata control basis, it would have been appropriate to do so only because she and her husband jointly and actively exercised control. *Cf.* 658 F.2d at 1002. Yet the individual members of the Plan did not jointly exercise any type of control, and neither did the Plan itself. The mere fact that the Plan members' interests, if added together, amounted to a majority of the outstanding shares in the Company does not, standing alone, entitle them to a pro-rata control value. The aggregate minority shares of a corporation always add up to 100 percent; that does not mean that a 5 percent shareholder enjoys a corresponding share in the control of the corporation.

As a final note, it might be instructive to look again at *Donovan v. Cunningham.* There the court held that it was legal error for the district court to have considered that, because a minority block of shares of employer stock sold by the sole shareholder to an ESOP, when aggregated with the seller's remaining shares, amounted to a controlling interest in the company, the minority block could have, consistent with ERISA, been sold for a control price. 716 F.2d at 1473 n. 38. The district court reasoned that, since the seller, who was also a fiduciary of the plan, was under an obligation to vote his shares only in the best interests of the plan beneficiaries, his shares and the minority ESOP shares formed one control unit. In rejecting this rationale, the circuit court emphasized that, not only did the seller owe fiduciary duties to other, non-plan shareholders, but that the fiduciary duties that he owed the plan shareholders were not sufficient to afford them the benefit of control "by operation of law." The lesson to be learned from *Cunningham*, then, is that minority parcels of stock in a larger entity, may—and even should—be valued on a minority basis, even though the parcels are aggregated under a common fiduciary who owes the same duties to all the shareholders. Such a result is fairly commonsensical when one considers again that, merely because the directors of a corporation owe fiduciary duties to all minority shareholders, it does not follow that those shareholders each enjoy a ratable share in the control of the corporation. It seems that, on the whole, two or more persons may be entitled each to a pro-rata share of a control value only where they together actively participate in the control of the company.[50] Such was not, however, the situation at U.S. News.[51]

---

**50.** In other words, such division of a control value might be appropriate in situations similar to that giving rise to the "family attribution" doctrine, discussed *supra* note 49.

**51.** In arguing that no discount should have been applied to the Plan stock, plaintiffs rely in part on an article by a Mr. Lawrence Lipkin, *The Theory of Minority Discount in Regard to ESOP Shares of Closely-Held Corporations,* 26 Valuation 130 (1980). Lipkin argues that minority discounts are inappropriate as applied to shares held in trust by fiduciaries for the benefit of the stock's equitable owners. His theory, which is concededly a departure from current law and practice, proceeds from the premise that the fiduciaries of the trust cannot "discriminate" against the interests of the trust beneficiaries and that, therefore, no discount should be taken to reflect the fact that the control entity—the trust—could take action that would be adverse to the best interests of the beneficiaries.

The problem with that theory is that it assumes that a minority discount reflects majority "discrimination" against minority shareholders, which discrimination presumably would be prohibited under ERISA. In fact, a minority discount only reflects that fact that the holders of minority interests in a corporation are not in a position to run the corporation. *See, e.g., Beerly v. Department of the Treasury,* 768 F.2d 942, 946–47 (7th Cir.1985), *cert. denied,* ⸺ U.S. ⸺, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986); *Estate of*

Because the Court finds that the U.S. News Class A and common stock were properly valued on a minority-interest basis, much of the testimony of plaintiffs' experts becomes irrelevant to the resolution of the issues remaining in this proceeding. The Court has found unpersuasive the testimony of Mr. Hempstead that a control valuation was appropriate. Hence, the Court does not consider further the testimony of Mr. Kobak and Mr. Harps that the Company's publishing business and its real estate holdings should have been given substantially greater weight than was accorded them by American Appraisal. The Court will return to the question of whether sufficient weight was given the Company's underlying assets, *infra* pp. 1530–33, but emphasizes now that it views plaintiffs' experts' treatment of those assets wholly unsupported by applicable valuation techniques.

### C. Discrimination Under ERISA

Plaintiffs maintain that the valuation of the Plan's stock during the class period on a minority basis unfairly discriminated against them in the payment of benefits in favor of those U.S. News employees who benefited from the 1984 sale. The Court has already ruled that no such discrimination took place, that the 1984 sale was an event different in kind from the annual valuations. 627 F.Supp. at 1170–71. There is no reason to rule otherwise now.

It is true that the tax regulations under which a plan covered by ERISA may qualify for favorable tax treatment prohibit discrimination in the payment of contributions or benefits in favor of certain categories of participants, primarily highly compensated employees, officers, or shareholders of the employer company. *See* IRC § 401(a)(4), 26 U.S.C. § 401(a)(4); Treas.Reg. §§ 1.401–1(b)(1)(ii), 1.401–4(a)(1)(i), 26 C.F.R. §§ 1.401–1(b)(1)(ii), 1.401–4(a)(1)(i); Rev. Rul. 80–155, 1980–1 C.B. 85. The U.S. News plan complied with these regulations throughout the class period; at least there is no evidence that the Plan was in danger

of losing its tax-qualified status. Moreover, the regulations cited certainly do not prevent a plan from being terminated or liquidated, which was what happened in 1984. And while ERISA prescribes conditions under which such a termination or liquidation may be undertaken, *id.* §§ 4041–68, 29 U.S.C. §§ 1341–68, those provisions of the statute are primarily concerned with the orderly winding up of plan business and the discharge of accrued liabilities in accordance with the terms of the plan. Nothing in ERISA requires that any gain realized from the liquidation of plan assets be distributed to persons who are no longer participants in the plan. Consequently, the allocation of the 1984 sale proceeds to current employees in accordance with their Plan interests did not, as a matter of law, discriminate against those employees who had left the Company in prior years.

### D. Underlying Asset Values

The conclusion that the Company's stock was properly valued on a minority-interest basis largely disposes of the question of whether and to what degree American Appraisal should have considered the value of the Company's underlying assets. As discussed *supra* p. 1526, in a control valuation, of course, asset values loom large, for a sale of a controlling interest in a corporation allows the buyer to realize the value inherent in those assets. This is so because the buyer may redirect management policies as he desires. In a minority valuation, however, assets may or may not play an important part in arriving at a per-share figure, because a minority shareholder cannot reach those assets. A minority shareholder is not in a position to influence or change management policies. Generally speaking, if the valuation being undertaken is of a business, such as U.S. News, that produces goods or services, primary consideration will be given to the earnings of the company and the resultant return on a shareholder's investment.

---

*Andrews,* 79 T.C. at 953; Fellows & Painter at 903–04. It is quite clear by now that the U.S. News employees did not run the Company in any way, either directly or indirectly. The Com-

pany was managed by the directors, as plaintiffs must concede after contending that they managed the Company poorly.

Rev.Rul. 59–60, Sec. 5(a), 1959–1 C.B. 242. Conversely, if the company is primarily an investment or holding company, the appraiser may accord greater weight to its underlying assets. *Id.* In either case, no precise formula can be established and adhered to in determining the relative weight to be assigned to asset values as against earnings. *Id.* Sec. 7, 1959–1 C.B. 243. Accordingly, a great deal of discretion must be left to the appraiser performing the valuation. *See, e.g., Donovan v. Cunningham,* 716 F.2d at 1473. *Cf. Sommers Drug Stores Co. Employee Profit-Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d at 1461–62 (fair market value of stock is not necessarily the quotient of asset values over shares outstanding).

As discussed earlier, American Appraisal's valuation methodology was for the most part a mixed approach that combined earnings analysis with some consideration of underlying asset values. Only in 1978 was no consideration at all given to the latter factor. The appraiser responsible for the 1978 valuation testified that he was uncomfortable with an asset-value approach, because he felt that such an approach was based upon the unrealistic assumption that minority shareholders could obtain value from assets over whose disposition they had no control.[52] *See* 28 Tr. 5570, 5579; 29 Tr. 5915–16, 5950–51 (Russell). In prior years, consideration had been given to underlying asset values because the Company either experienced poor earnings, as in 1976 and 1977, or had suffered actual losses, as in 1975. In subsequent years, because development plans were becoming ever more imminent, some amount of weight was given to the Company's real estate holdings. In 1981, of course, the value of the new real estate joint ventures was reflected in the appraisal.

■ Having reviewed the testimony of the various appraisers who performed the annual valuations, as well as the testimony of the parties' expert witnesses, the Court concludes that American Appraisal's mixed valuation approach adequately took account of the Company's underlying assets. In valuing a going concern, in the absence of factors tending to diminish the reliability of a strict earnings approach, asset values are generally accorded little weight. *See, e.g., Cochran v. Commissioner,* 7 T.C.M. 325, 337 (1948); *Hooper v. Commissioner,* 41 B.T.A. 114, 129 (1940), *acq.,* 1940–1 C.B. 3; *see also* 69 Tr. 13,293 (Gougis). If, on the other hand, less confidence can be placed in an earnings approach, a consideration of asset values may be required, such as when a company has or will face losses or holds substantial investment assets. *See, e.g., Gallun v. Commissioner,* 33 T.C.M. 1316, 1320–21 (1974) (operating business in declining industry; investment assets of far greater value); *see also* Fellows & Painter at 911–12. While it is true that, throughout the class period, U.S. News held certain investment *opportunities,* these did not comprise the sort of investment assets that would have counseled a more searching asset valuation. *Estate of Andrews* is not to the contrary.

In *Estate of Andrews,* the Tax Court was required to arrive at a *de novo* valuation of certain stockholdings that formed part of the decedent's gross estate. It is true that the court took pains to emphasize its feeling that underlying asset values were important to such a valuation. 79 T.C. at 946–51. However, it also noted that a consideration of asset values was appropriate because of the nature of the companies whose stock was being valued. The court found that they were neither real estate investment companies, strictly speaking, whose investment value was passed through to its stockholders regardless of actual earnings, nor wholly operating companies, whose investment value was limited by its earnings and dividend-paying histories. *Id.* at 944–46. Rather, the companies were actively involved in the

---

**52.** The appraiser who performed the 1974 valuation similarly thought it unrealistic to give any weight to asset values and did not do so in his final report. However, in testing his preliminary figures, he did perform a number of calculations that took asset values into account. Those "checks" confirmed for him the reasonableness of the values he obtained from his earnings approach. *See* 22 Tr. 4357–58; 23 Tr. 4424–28, 4435–43, 4513–15 (Walker).

"ownership, operation, and management of commercial real estate properties," *id.* at 939, and also held some liquid assets such as cash, stocks and bonds. *Id.* Accordingly, the court gave some degree of weight to the value of the companies' underlying assets. Then, in keeping with standard valuation practice, the court discounted the gross value of the stock to reflect a minority position in the companies being valued. *Id.* at 956–57.

Even if this Court were required to make a *de novo* redetermination of the value of the Company's stock in each of the class years, it would be inclined to follow, more or less, the approach used by American Appraisal. As defendants' expert, Mr. Gougis, has cogently argued, U.S. News was, prior to 1981, primarily a publishing company, which held some undeveloped investment property. 69 Tr. 13,328. In 1981, of course, the Company's situation changed dramatically, yet American Appraisal's approach changed, too. Prior to 1981, the appraisers did, where appropriate, accord value to the Company's real estate consistent with the contemporaneous state of development plans for those holdings.[53] And so, when development of the real estate became a reality, the projected income from the joint ventures was added to the value of the publishing business. While at all times the appraisers discounted the asset values before adding them to the value of the operating business, as noted in the discussion of *Andrews, supra,* such a minority discount is perfectly in accord with standard appraisal practice. *See also Sommers Drug Stores,* 793 F.2d at 1462; *Gallun,* 33 T.C.M. at 1320–21; Fellows & Painter at 910–13. The discounts that American Appraisal took were typically in the 15–35 percent range, well within standard practice.[54]

Other than the Company's real estate holdings, plaintiffs point to certain other assets that they say were not properly accounted for in the annual appraisals. One such "asset" was the Company's "deferred subscription liability," which represented funds that U.S. News received through the sale of subscriptions that were to be later filled. Under its accrual method of accounting, the Company treated those funds as a liability, because they represented the future costs associated with producing and distributing the magazines that had already been paid for. Perhaps because U.S. News placed the funds in short-term investments to increase the "buffer" between monies received and anticipated future expenses, plaintiffs and their experts, Mr. Kobak and Mr. Hempstead, have termed this liability an "asset." Moreover, they claim it was an asset excess to business, whose value should have been reflected in the value of the Company's stock. For their part, defendants have more than adequately pointed out that the "asset," if it were indeed such, was necessary to keep the publishing business operating in the black and that the treatment of it as a liability was perfectly reasonable. *See* RDX 73 at 3. Moreover, even if it should have been termed an asset rather than a liability, there would have been no reason to value it separately in the appraisals. The income that it generated, which was used in the publishing operations, was reflected in the appraisals as part of the Company's net income. Separate treatment would have been appropriate, if at all, only in a control valuation, which might have assumed that new management could have found another way of utilizing the funds in question.[55]

---

**53.** Even plaintiffs' real estate expert, Mr. William Harps, acknowledged that development studies prepared in anticipation of development plans yet to be drawn up would not be relevant to a current appraisal of the subject property. *See* 33 Tr. 6599; 34 Tr. 6766–69. Moreover, because it was reasonable to give only limited weight to the value of the Company's real estate, it is certainly not necessary to inquire into how a real estate appraiser would have valued the land in each year of the class period.

**54.** The court in *Gallun,* for instance, applied a 55 percent discount. 33 T.C.M. at 1321.

**55.** Indeed, plaintiffs' expert, Mr. Kobak, seems to have made just such assumptions.

In a related argument, Mr. Hempstead maintains that the contributions that the Company made to the Plan were really disguised dividends that should have been added back to net income. Yet, as defendants point out, the contributions were based upon employee compen-

Other assets that American Appraisal allegedly failed to properly take into account were U.S. News holdings of Atex, PPI and other investments. The record more than amply demonstrates, however, that at least until 1981, these investment holdings would have been of marginal, if any, concern to investors in U.S. News stock. In 1981, the Company exchanged its Atex stock for shares in Eastman Kodak and thus realized an extraordinary gain. In keeping with standard appraisal practice, American Appraisal excluded this extraordinary gain from net income in its earnings analysis. It did, however, include a year's worth of dividends on the Kodak stock in its income figures. *See* PX 21 at 19, 30. Even by 1981, the Company's investments in PPI and its other ventures, while potential income-producers, had not yet materialized as significant sources of revenue. Accordingly, they would have held little attraction for potential investors in U.S. News and, thus, figured minimally in the appraisals. *See* PX 21 at 13. In choosing market multiples to be applied to the 1981 earnings, however, American Appraisal did take into consideration the favorable future outlook of those investments. *See id.* at 29–30. In short, American Appraisal's attention to the Company's various investment assets fairly met the criterion of reasonableness.

### E. Marketability Discount

Quite apart from whether the stock of U.S. News should have been valued on a control or minority basis, plaintiffs challenge American Appraisal's application of a 10 percent discount to reflect the stock's lack of marketability. Plaintiffs maintain that, because the Company always exercised its option to repurchase the bonus stock, there was a "ready market" for that stock, rendering use of a marketability discount inappropriate. As for the Plan stock, they contend that a marketability discount can never be applied to a control block of stock.

It should be stated at the outset that the use of a marketability discount did not run counter to the admonition in Article Fifth against considering the effect that the restrictions on transfer contained therein would have had on the value of the stock.[56] Rather, the appraisal reports stated explicitly that the marketability discount was meant to reflect the fact that, quite apart from such restrictions, the stock of a closely-held company is generally less attractive to potential investors than publicly traded stock. *See, e.g., Sommers Drug Stores,* 793 F.2d at 1462; *Hooker Industries, Inc. v. Commissioner,* 44 T.C.M. 258, 267 n. 26 (1982); *Estate of Andrews,* 79 T.C. at 953, 957; *Cochran,* 7 T.C.M. at 337; Fellows & Painter at 920–21 & n. 89.

### 1. As to the Common Stock

Plaintiffs argue that, because U.S. News invariably repurchased employees' bonus shares, the Company created a ready market for that stock, which should not have been discounted, then, for any lack of marketability. Nevertheless, as defendants' expert Shannon Pratt points out, the Company was under no obligation to repurchase the stock. It had, rather, an option to *call* the stock; employees did not have the option to "put" the stock to the Company.[57] Moreover, even when it did decide to repurchase parcels of stock, the Company could—and from time to time did—exercise its option under Article Fifth (g) to pay for the stock on terms that would not have

---

sation, not company profits, and thus should not be considered "dividends." Moreover, given the standard of review applicable here, the Court sees no reason to become embroiled in tangential accounting issues.

**56.** If those restrictions had been considered, they would have most likely required application of a greater discount. Certainly stock is worth less if it can be disposed of only upon the holder's death or termination from employment.

**57.** A marketability discount might be appropriate even where the holder of the stock does have a "put" option. *See Hooker Industries,* 44 T.C.M. at 267 n. 26. *But see* S. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely-Held Companies* 342 (1981) (where shares are consistently redeemed under put option for cash, zero marketability discount might be justified).

been accepted gladly by an outside investor.[58]

Although it probably would not have been justifiable for American Appraisal to have excluded a marketability discount from its valuation, in view of the fact that U.S. generally did redeem the shares for cash, the appraisers consistently concluded that a modest discount of 10 percent was appropriate. Experts for both sides have recognized a wide range of possible discounts. Defendants' expert, Mr. Gougis, stated that discounts generally fall in the range of 20 percent to 60 percent. 69 Tr. 13,252. Plaintiffs' expert Mr. Hempstead testified that he had in the past used discounts of 40 percent and 50 percent. 48 Tr. 9498. It would be impossible, then, for the Court to conclude that American Appraisal's use of a 10 percent discount was anything but reasonable.

### 2. As to the Class A Stock

 While American Appraisal did not separately analyze the question of whether a marketability discount was appropriate for the Class A stock, based upon the expert testimony and case law, the Court concludes that it was.

In supporting use of the discount, Mr. Pratt testified to a number of scenarios in which the restricted marketability of the Plan's holdings would have made itself felt. 61 Tr. 11,890–93. First, if the Plan sold shares directly to U.S. News employees, those shares, which would have been deemed converted to common stock under Article Fourth (d)(ii), would have been subject to the restrictions on transfer. Similarly, if the Plan sold its shares to U.S. News, they would have been, again, converted to common and made subject to the transfer restrictions. Finally, it should be noted that, if the Class A stock were sold to a third party, it would still represent a

block of stock in a company whose stock was not widely traded.[59] As such, it would be relatively less attractive to an investor, rendering application of a marketability discount—contrary to plaintiffs' assertion—appropriate. *See Estate of Andrews,* 79 T.C. at 953 (marketability discount may be applied to a control block); Fellows & Painter at 920–21 (same); *see also* Pratt, *supra* note 57, at 148 (marketability discount reflects stock's "illiquid[ity]," not the size of the block valued). Mr. Pratt also noted, that, if the Plan sold its holdings in a public offering, it would have been required to pay registration fees and commissions amounting to at least 10 percent of the stock's value. In a way, such costs associated with the sale of a block of stock can be said to be equivalent to, or to reflect, the stock's relative lack of marketability.

On the whole, then, the modest 10 percent marketability discount that American Appraisal applied generally to the U.S. News stock in the aggregate was perfectly appropriate as applied specifically to the Class A stock.

### F. Miscellaneous Challenges to Particular Appraisals

In addition to the issues pertaining to all the appraisals, issues which have been resolved by the preceding discussion, plaintiffs challenge several of the appraisals in a number of particular respects. They assert that the 1973 appraised value was not supported by a formal written report and that the 1974 and 1977 appraisals contain certain numerical errors.[60] Each of these challenges will be considered in turn.

### 1. The 1973 Appraisal

 It is undisputed that the 1973 valuation was not supported by a written report, although one was requested. Plain-

---

**58.** Article Fifth (g) gave the Company the option of repurchasing the bonus shares in exchange for 15–year, subordinated notes, bearing 5 percent simple interest. Mr. Pratt testified that these terms should be considered relatively unfavorable. *Cf.* Pratt, *supra* note 57, at 342.

**59.** This would remain true quite apart from the question of whether the purchaser could have the transfer restrictions eliminated.

**60.** Plaintiffs, of course, assert that the 1978 and 1980 year-end appraisals must be rejected as the products of collusion between U.S. News and American Appraisal. That challenge has already been considered, *supra* pp. 1511–13. The Court there concluded that the appraisals were not tainted by improper conduct and that the values arrived at were otherwise within the range of reason.

tiffs maintain that, in the absence of such a report, the 1973 value must be rejected. That conclusion does not necessarily follow.

First, a number of credible witnesses have established that it is the conclusion of value, not the written report, that is important. Indeed, some very large transactions have apparently turned upon values that were supported only by a single-page "letter" report. Moreover, if the conclusion is reasonable, a report would serve only to memorialize the appraiser's thinking. There is nothing, however, to suggest that the 1973 per-share value was not reasonable or, more specifically, was too low. If anything, judging by the movement during the period in the price of the Company's stock, it was too high. The 1973 value was determined to be $80.00 per share, while the 1970 value [61] was $65.00; the 1974 and 1975 values, also $65.00; and the 1976 value, $77.00.

Second, if the 1973 value is to be rejected, it must be replaced by something else. Yet plaintiffs have failed to offer an alternative minority value, and since it is not left with this Court to determine such a value itself *de novo*, the 1973 value of $80.00 must stand. Of course, if the Court were to make such a determination, it might determine that it would be appropriate to interpolate a figure based upon values rendered between 1970 and 1975 or 1976, which figure would necessarily be lower than $80.00 per share.[62]

### 2. The 1974 and 1977 Appraisals

■ Plaintiffs challenge the appearance in the 1974 and 1977 reports of figures that they argue are objectively incorrect. In the 1974 appraisal, for instance, it appears that the appraiser used an income figure from the unaudited financial statements, which he then failed to correct upon receiv-

ing the final statements. The difference would have amounted to some $4.00 per share. Mr. Walker, the appraiser in question, testified that, because any valuation is an approximation at best, he saw no reason to change his figures to reflect actual earnings.[63]

Similarly, the appraiser who prepared the 1977 report made several minor computational errors, which at most would have increased the per-share value by $1.50 or $1.75. While it is hard to expect plaintiffs to be content with an appraisal report that contains known, quantifiable errors, it is also true that, in the greater scheme, those errors are *de minimis*. First, the errors are so small as to be negligible when one considers that an appraisal is only an approximation, whose results are often rounded down to the nearest dollar, or five- or ten-dollar increment. Second, it certainly does not fall to this Court to check each of the challenged appraisals for perfect arithmetic accuracy. As pointed out earlier at some length, the defendants' decision to award benefits each year based upon the current appraised value of the Company's stock will be overturned only if in any year that decision was unreasonable. It certainly was not unreasonable for defendants to have paid out benefits based upon an appraisal that turned out later to have been "off the mark" by less than two dollars per share.[64]

### G. Failure to Disclose Appraisal Reports

Plaintiffs have charged, rather obliquely, that defendants' failure to provide them with each year's appraisal report was an independent violation of ERISA. What relief they seek, however, is not clear.

■ It is true that ERISA enumerates certain types of documents which must au-

---

**61.** Unfortunately, reports for 1971 and 1972 were not rendered either, and the values determined for those years do not otherwise appear to be available.

**62.** The value that defendants' expert, Mr. Gougis, determined in his "blind" appraisal for 1973 was only $64.00.

**63.** While one might find that attitude rather cavalier at first blush, it should be noted that

Mr. Walker has achieved one of the highest distinctions that his profession has to offer. *See supra* p. 1502.

**64.** It should also be noted that the estimates of plaintiffs' experts—even different estimates by the same expert—varied widely, sometimes by as much as 90 percent.

tomatically be provided to plan beneficiaries. These include all "instruments under which the plan was established or is operated." *Id.* § 104(b)(2), 29 U.S.C. § 1024(b)(2).[65] Yet there is nothing to suggest that the appraisal reports were documents falling into that category. They certainly were not involved in the "establish[ment]" of the Plan, nor was the Plan "operated" under them. Indeed, as defendants point out, the only information that they contained relevant to the Plan was the final per-share value for each year. Yet that was information that everyone at U.S. News knew; it was certainly not kept secret. Finally, even if the Plan improperly failed to make the appraisal reports available under section 104(b)(2), no private right of action is implied under that section that would entitle plaintiffs to any form of relief. *Bruch v. Firestone Tire & Rubber Co.,* 640 F.Supp. 519, 533 (E.D.Pa.1986).

More importantly, however, plaintiffs have not shown that they have been damaged by the failure of the Plan to distribute the reports. They have not shown that they would have sued sooner if they had had the reports, and even if they attempted to make such a showing, in view of the disposition of this proceeding, it would have been irrelevant. They have not sought any specific relief relative to the reports, and since this proceeding does not turn upon a resolution of the statute of limitations issue, the reports' non-distribution as it relates to concealment or notice is, again, irrelevant.

In short, plaintiffs' claim under section 104 appears simply as a make-weight and a non-meritorious one at that. It should be noted, too, that during the extended trial of this matter no individual plaintiff nor any other class member testified that he or she asked to see an appraisal report. Further, the record shows that, had such an employee asked to see an appraisal report, it would have been made available to him.

Employees were indeed given much information as to how the stock was valued. *See supra* pp. 1510–11.

**H. Actions of the Fiduciaries**

Throughout this proceeding plaintiffs have turned loose a steady steam of criticism at the officers, directors, and corporate managers responsible for important policy decisions at U.S. News. Plaintiffs charge those defendants with a lack of knowledge and clear understanding of their responsibility and an inability to make the decisions necessary to protect adequately their interests and the interests of the employee-shareholders in general. The case law is clear that ERISA fiduciaries need not themselves possess experience or expertise in accounting, appraisal or actuarial sciences as they relate to the many facets of plan administration, as present here. The law is also clear that fiduciaries may rely on expert and professional advice in administering a plan. *See Witmeyer v. Kilroy,* 788 F.2d 1021, 1024–25 (4th Cir. 1986); *see also Donovan v. Cunningham,* 716 F.2d at 1474; *cf. Aaronson v. Lewis,* 473 A.2d 805, 816 (Del.1984) ("business judgment rule" allows director to reasonably rely upon others' expertise).

Over the course of the class period, as in years prior, the director-fiduciaries secured and relied on the expertise of American Appraisal. As to problems relating to the Plan and valuation issues, they also relied upon the knowledge and judgment of treasurers Padrutt and Naimoli, who in turn obtained and relied on the legal advice from Don Harris and other attorneys in his firm. Finally, the Ernst & Whinney accounting firm prepared audits of the Profit-Sharing Plan's financial statements. In those audits, Ernst & Whinney certified that reasonable methods were utilized in the valuation of the Class A stock. The fiduciaries received sound advice and counsel on ERISA and other matters as required under relevant case law.

---

**65.** ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), provides that copies of such documents must be furnished if *requested.* If such a request is denied, fines or other relief against the plan administrator may be sought under section 502(c), 29 U.S.C. § 1132(c). That provision, however, only applies to denials of requested information. *Bruch v. Firestone Tire & Rubber Co.,* 640 F.Supp. 519, 533 (E.D.Pa.1986). Because the record shows that none of the plaintiffs ever sought to see an appraisal report and was denied, section 502(c) is inapplicable.

## I. Statute of Limitations

■ As stated at the beginning of this Memorandum Opinion, plaintiffs' claims can be grouped into two categories. The first consists of those claims premised upon intentional or fraudulent conduct and includes those for breach of the fiduciary duty of loyalty under ERISA § 502(a)(3), securities and common-law fraud, common-law breach of fiduciary duty, and unjust enrichment. The second comprises claims based upon arbitrary, capricious, negligent or imprudent conduct and embraces those for breach of the fiduciary duty of care under ERISA § 502(a)(3), for benefits due under ERISA § 502(a)(1)(B), and for negligence and negligent misrepresentation. The statute of limitations as to claims in the first category may be tolled, if at all, under the doctrine of fraudulent concealment. Tolling of the statute under that doctrine requires that plaintiffs show (1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) they were not on actual or constructive notice of that evidence, despite (3) their exercise of due diligence. *Hobson v. Wilson,* 737 F.2d 1, 33–36 (D.C.Cir.1984), *cert. denied sub nom. Brennan v. Hobson,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). The statute may be tolled as to claims in the second category either under the fraudulent concealment doctrine [66] or under the discovery rule. The latter doctrine applies in certain cases in which a plaintiff who has relied upon the advice or expertise of another—generally, a professional—and who is injured thereby is not in a position to discover the injury within the limitations period. In such cases, the plaintiff's cause of action will not be said to accrue until he discovers, or with reasonable diligence could discover, the injury. *See, e.g., Byers v. Burleson,* 713 F.2d 856, 860 (D.C.Cir. 1983). While the doctrine has been applied in cases of legal malpractice, as in *Byers,* as well as medical and architectural malpractice, *see, e.g., Wilson v. Johns-Manville Sales Corp.,* 684 F.2d 111, 115–21 (D.C.Cir.1982); *Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192, 1201–02 (D.C. 1984), it seems that the local courts would extend the doctrine to a case such as this, if the situation presented itself.

As discussed in connection with defendants' Rule 41(b) motions, *supra,* the record reveals no evidence of fraudulent conduct, either in connection with the alleged underlying wrongs, or subsequent thereto.[67] Hence, the doctrine of fraudulent concealment simply does not come into play, and any claim accruing outside the limitations period would be time-barred.[68] Similarly, because the Court finds that plaintiffs were at least on constructive notice of facts underlying their cause of action well before the commencement of these proceedings, tolling of the statute under the discovery rule would be defeated as to any claim falling outside the limitations period.[69]

Plaintiffs in *Foltz* commenced the first of the two suits upon learning that an offer had been made to buy the Company for somewhat more than twice its last appraised value. As defendants point out, then, the knowledge or realization that the Company could be sold for more than the

---

**66.** In cases of fraud, the concealment is most often tied into the underlying wrong. *Hobson,* 737 F.2d at 33 & n. 102. Where a defendant is charged with wrongful but not fraudulent activity, the wrongs must be concealed by subsequent fraudulent acts. *Id.*

In addition, any claim under ERISA § 502(a)(3) may only be tolled under the fraudulent concealment doctrine incorporated in section 413, 29 U.S.C. § 1113; claims under section 502(a)(1)(B) may be tolled by whatever rules local law provides.

**67.** To the extent that it is relevant, defendants did disclose the existence of the phantom stock awards. They appeared on the balance sheets distributed to employees as of 1977, PX 144–48, and were the subject of remarks made by Mr. Sweet at the 1978 shareholder luncheon, PX 11 at 24–25, as well as a memorandum to employees dated September 18, 1978. PX 10 at 9.

**68.** The relevant statutes of limitation are set out at 627 F.Supp. at 1149 n. 5, 1156 & n. 26; 639 F.Supp. at 600–01 & n. 13.

**69.** In addition, the six-year statute of limitations, otherwise applicable to a claim under ERISA § 502(a)(3), is reduced by notice on plaintiffs' part to three years from the date of such notice. *Id.* § 413(a)(2), 29 U.S.C. § 1113(a)(2).

appraised value of its stock was in fact sufficient to put plaintiffs on notice of a potential claim. Yet the record is fairly clear at this point that plaintiffs were at least on constructive or inquiry notice of that disparity in value throughout the class period.

Taking the 1979 year-end appraisal as an example, one notes that employees were told at the 1980 shareholder luncheon that the real estate was worth potentially $14 to $15 million. PX 12, Q & A at 9–10. Employees were also told that the Company had more than $17 million in net assets, PX 12 at 34–25, and that the 1979 appraised price per share was $125. *Id.* at 31. From the year-end 1979 balance sheet distributed to employees, anyone interested could have learned that there were 61,638 shares outstanding and by doing the appropriate multiplication could have discovered that the appraised price per share yielded an aggregate value for the Company's stock of only some $7.7 million, dramatically less than either the real estate alone, or the total net asset value.

Examples such as the above can be multiplied, encompassing each year of the class period.[70] Suffice it to say that any employee who was curious—and, as discussed above, there were plenty who had misgivings about the way in which the Company was valued—could have learned that the aggregate minority value of the Company, or the product of the appraised per-share price and the number of shares outstanding, was always substantially less than the "true" value of the real estate—that is, its book value multiplied by a factor of three, or some equivalent value gleaned through the employees' general awareness of land values in the area.

In sum, even were the Court not to rule for defendants in these proceedings, most of plaintiffs' claims would be time-barred under the relevant statutes of limitations.

## IV. CONCLUSION

This class action litigation was triggered by the impending sale of the entire U.S.

News Company for a much greater per-share price than that which plaintiffs had received for their stock and profit-sharing interests upon their retirement or separation. Plaintiffs claim that they were unaware of the true value of the entire Company, that it was never disclosed to them, and that they became aware of it only when it was announced in December 1983 that the Company was to be sold. Plaintiffs have failed to prove and support their claim in that regard. Defendants presented a substantial and credible record to the contrary.

An issue of key importance to plaintiffs' case was whether U.S. News stock was properly valued on a minority basis during the class period. While plaintiffs presented abundant testimony and evidence covering a wide range of subjects and theories, much of their presentation had little relevance or probative value. The Court concludes that it was at least reasonable to have valued both classes of U.S. stock on a minority-interest basis and to have given only such weight to underlying asset values as the appraisers saw fit. In view of that determination, it becomes unnecessary to engage in further analysis of other challenges to U.S. News management practices during the class period. The outcome of the annual appraisals was not the result of any sort of deliberate misconduct on the part of the several defendants.

While several directors had less input than others into the overall appraisal process, those who involved themselves more fully in that process did so in an entirely appropriate manner. Even if the directors had been inattentive in their review and acceptance of the appraisals—and they were not—rendering their reliance upon any erroneous report unreasonable, such inattention could not have resulted in any harm to plaintiffs, for the appraisals dur-

---

**70.** *See generally* Defendants' Proposed Findings of Fact and Conclusions of Law with Respect to the Court's Ruling on Their Rule 41(b) Motions ¶¶ 218–35, 239–42; 639 F.Supp. at 602–03 & n. 16.

ing the class period were in fact perfectly reasonable and acceptable.

It is understandable that plaintiffs should be disappointed that they were unable to enjoy the fruits of the 1984 sale of U.S. News to Mortimer Zuckerman. Be that as it may, there is no basis in the law as it presently stands for distributing the proceeds of that sale otherwise than has been done. As long as it was appropriate to value the Company's stock on a minority-interest basis during the class period, defendants cannot be faulted because the gain realized from the Company's subsequent sale did not benefit the former as well as current employees of U.S. News. Defendants are no more to be held accountable for such a situation under ERISA than they would have been at common law. Of course, Congress could have structured ERISA in such a way as to address problems such as that created by the sale of an employee-owned company, but it did not.

Plaintiffs have failed to support their several claims by a preponderance of the evidence. They are not entitled to a judgment declaring defendants' liable. The consolidated complaints in this matter should be dismissed. Defendants shall submit by July 6, 1987, an order consistent with this Memorandum Opinion.